*Maryland Department of Health v. Jeffrey Boulden, et. al.*, No. 35, September Term, 2025. Opinion by Biran, J.

**CRIMINAL PROCEDURE – DEFENDANTS FOUND INCOMPETENT TO STAND TRIAL AND DANGEROUS – STATUTORY SANCTIONS** – When a court finds a criminal defendant to be incompetent to stand trial and dangerous ("IST"), the court must order the defendant committed to a designated health care facility for treatment to restore the defendant to competency. By statute, the Maryland Department of Health (the "Department") is required to admit an IST defendant to a designated facility as soon as possible, but not later than 10 business days after the Department receives the court commitment order. Under Md. Code Ann., Crim. Proc. ("CP") § 3-106(c)(4) (2025 Repl. Vol.), if the Department fails to meet the 10-day deadline, a court "may impose any sanction reasonably designed to compel compliance[.]" The Supreme Court of Maryland held that a court is authorized under CP § 3-106(c)(4) to impose monetary sanctions that are reasonably designed to compel the Department to admit the defendant before the court to a designated facility as soon as possible after expiration of the 10-day deadline. If there is a waiting list for admission to a designated facility, a court may sanction the Department for each day that it does not manage the waiting list so as to admit the defendant before the court as soon as possible beginning on the eleventh business day following receipt of the defendant's commitment order. The Court held that the sanctions orders issued in Respondents' cases were reasonably designed to compel the Department to admit Respondents to designated facilities as soon as possible.

**CRIMINAL PROCEDURE – DEFENDANTS FOUND INCOMPETENT TO STAND TRIAL AND DANGEROUS – STATUTORY SANCTIONS** – The Supreme Court of Maryland held that a court does not lose its authority to impose sanctions under CP § 3-106(c)(4) after the Department belatedly admits a defendant to a designated facility.

**APPELLATE PRACTICE – WAIVER – MARYLAND RULE 8-131** – The Supreme Court of Maryland held that the Department waived its argument concerning separation of powers after it raised the argument at one of the circuit court hearings and abandoned it on appeal. However, in light of the Court's decision to invite supplemental briefing concerning separation of powers and the possibility that the Department may raise the same argument in future cases, the Court exercised its discretion under Maryland Rule 8-131(b) to decide the issue.

**MARYLAND CONSTITUTION – SEPARATION OF POWERS – COURTS' IMPOSITION OF SANCTIONS UNDER CP § 3-106(c)(4)** – The Supreme Court of Maryland held that the General Assembly did not violate the separation of powers by providing courts with the discretion to impose sanctions under CP § 3-106(c)(4). In awarding sanctions to enforce compliance with CP § 3-106, a court engages in a quintessential judicial function that is specifically authorized by law.

Circuit Court for Kent County
Case Nos. C-14-CR-21-000044, C-14-CR-23-000050, C-14-CR-23-000146

Circuit Court for Baltimore County
Case Nos. C-03-CR-24-000015, C-03-CR-24-000251, C-03-CR-23-002969,
C-03-CR-23-003449, C-03-CR-23-003775

Argued: January 6, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 35

September Term, 2025

---

MARYLAND DEPARTMENT OF HEALTH

v.

JEFFREY BOULDEN, ET AL.

---

Watts
Booth
Biran
Gould
Eaves
Killough
Hotten, Michele D., (Senior Justice,
    Specially Assigned),

JJ.

---

Opinion by Biran, J.
Booth, Gould, and Killough, JJ., dissent.

---

Filed: July 15, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A long-established imperative in our criminal justice system is that defendants must be competent to stand trial. The standard to determine competency in Maryland is whether the accused is able to understand the nature of the proceedings against them and to assist in their defense. The prohibition against trying an incompetent defendant stems from the defendant's due process right to a fair trial. In Maryland, when a court finds that a defendant is not competent to stand trial and dangerous to self or others because of a mental condition ("IST"), the court must order the defendant to be committed to a health care facility administered by the Maryland Department of Health (the "Department" or "Health Department"), the Petitioner before us. After the Department receives custody of the defendant, the Department attempts to restore the defendant to competency through treatment.

In 2016, a group of criminal defendants deemed IST brought a civil suit against the Department for its failure to comply with commitment orders mandating their transfers to a designated health care facility within one day. *See Powell v. Maryland Dep't of Health*, 455 Md. 520, 533-34 (2017). The defendants brought both a statutory claim under Md. Code Ann., Crim. Proc. ("CP") § 3-106 (2001, 2008 Repl. Vol., 2013 Supp.), and a constitutional claim alleging that the failure to admit them to designated facilities violated their right to due process guaranteed by Article 24 of the Maryland Declaration of Rights. *See id.* at 536. This Court affirmed the circuit court's dismissal of the statutory claim. *Id.* at 542-48, 555. At that time, CP § 3-106 did not authorize a court to set a deadline for admission. *Id.* at 543. We explained that, in the absence of a statutory deadline, the

reasonableness of any delay must be assessed on a case-by-case basis, considering a host of factors. *See id.* at 552.

The General Assembly responded quickly to *Powell*, amending CP § 3-106 in 2018 to mandate a uniform admission timeline for all defendants deemed IST. The Department now is required to place every IST defendant in a designated facility as soon as possible, but not later than 10 business days after the Department receives the court commitment order. *See* CP § 3-106(c)(2)(i) (2025 Repl. Vol.). If the Department fails to meet the 10-day deadline, the court "may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant" beyond the deadline. *Id.* § 3-106(c)(4).

Respondents Jeffrey Boulden, Glenn Hawkins, William Lomax, Kennard Goins, Malik Jackson, and Steven Kauffman were each found IST by a circuit court. The Department failed to comply with the 10-day deadline in admitting Respondents to designated health care facilities. Respondents then sought and obtained sanctions against the Department under CP § 3-106(c)(4). Four of the Respondents (Messrs. Boulden, Lomax, Jackson, and Kauffman) had not yet been transferred to hospitals when the circuit courts held hearings and imposed sanctions. The other two Respondents (Messrs. Hawkins and Goins) received their placements before the hearing in their cases. The court also imposed sanctions in their cases.

On appeal, the Appellate Court of Maryland held that the circuit courts did not abuse their discretion in deciding to impose sanctions. However, the Appellate Court ordered a

2

remand in four of the cases for recalculation of the amount of sanctions. The Department sought further review in this Court.

The Department argues before us that the circuit courts abused their discretion by imposing sanctions in all six cases. In the Department's view, none of the sanctions orders were "reasonably designed to compel compliance" within the meaning of CP § 3-106(c)(4) because it was impossible for the Department to comply with the 10-day deadline. In support of that assertion, the Department points to the long waiting list that existed for admission to designated facilities. The Department also asserts that it must prioritize admission based on acuity of illness, and that this requirement made it impossible to admit Respondents more quickly.

As to Messrs. Hawkins and Goins, the Department contends that the sanctions also were not reasonably designed to compel compliance for a second reason: because the Department admitted them to designated facilities before the court imposed sanctions, the Department asserts that there was no compliance left for the court to compel.

Finally, the Department argues that, in imposing sanctions in these cases, the circuit courts violated Article 8 of Maryland's Declaration of Rights, which requires the separation of governmental powers.

We disagree with the Department on all points and affirm the judgment of the Appellate Court.

# I

## Background

After being charged with criminal offenses, Respondents were found IST under CP § 3-106(c)(1)(i).[1] As a result, the courts presiding over their cases issued orders committing Respondents to the Department "until the court is satisfied [Respondent] is no longer incompetent to stand trial or is no longer, by reason of a mental disorder or mental retardation, a danger to self or the person or property of another." The Department was required to admit Respondents to a "designated health care facility"[2] "as soon as possible,

---

[1] CP § 3-106(c)(1)(i) provides:

If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of a mental disorder or an intellectual disability, is a danger to self or the person or property of another, the court shall order the defendant committed to the facility that the Health Department designates until the court finds that:

1. the defendant no longer is incompetent to stand trial;

2. the defendant no longer is, because of a mental disorder or an intellectual disability, a danger to self or the person or property of others; or

3. there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

[2] Health care facilities designated for competency restoration include facilities owned or operated by the Department, state forensic residential centers, and hospitals and private residential facilities with which the Department contracts to house and treat IST individuals. CP § 3-106(a)(1); Md. Code Ann., Health-Gen. ("HG") § 10-101(k) (1982, 2023 Repl. Vol., 2025 Supp.). A "designated health care facility" does not include a correctional or detention facility. CP § 3-106(a)(2).

but not later than 10 business days after the Health Department receive[d] the order of commitment[.]" CP § 3-106(c)(2)(i).

The Department failed to timely admit Respondents to designated facilities. Respondents filed motions seeking relief for the Department's violation of the deadline. As stated above, CP § 3-106(c)(4) provides that, if the Department fails to admit a defendant to a designated health care facility within 10 business days, "the court may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant" beyond the deadline. The circuit courts held hearings with respect to the Department's failure to admit Respondents, and imposed sanctions in each case.

## A. Mr. Boulden (Kent County Circuit Court)

Mr. Boulden was charged with various crimes in three cases filed in the Circuit Court for Kent County. On February 2, 2024, the circuit court issued commitment orders in Mr. Boulden's cases. After the Department failed to admit Mr. Boulden to a designated health care facility within 10 business days, Mr. Boulden's attorney moved for an order to show cause. A hearing on Mr. Boulden's motion went forward on April 5, 2024, before the Honorable Harris P. Murphy. As of the date of the hearing, the Department had not admitted Mr. Boulden to a designated health care facility.

The Department called as its only witness Bryan Mroz, then the Deputy Secretary of Operations of the Department's Healthcare System. Mr. Mroz testified that there were 1,056 beds across designated health care facilities within the state, with the average length of stay being a little over two years. According to Mr. Mroz, the current daily cost to

5

hospitalize an IST individual was approximately $600 to $1,000. All beds were occupied at the time of the April 5, 2024 hearing, and 202 individuals were on the Department's waiting list, including Mr. Boulden. Mr. Mroz thought there were also five hospital warrants open at the time.[3] Regarding how defendants move up or down on the waiting list, Mr. Mroz explained:

> Well, it takes into account when we get the order. So if things were neutral, you know, it would just go through as they come in. But we do look at things such as acuity, which is a big factor which moves people up the list. We also have to take into account a hospital warrant, which is somebody in the community who made [sic] need to come back immediately, and those have to be incorporated into the list. We also look at the type of charges. So that's also incorporated into the list. And then also how long somebody has just generally been on the list, because we don't want somebody that -- being at the bottom. We have to take that into account also as we move through.

The waiting list had grown over the past several years, Mr. Mroz testified, due to several factors: (1) incoming court commitment orders in recent years had begun to vastly outnumber the beds available statewide; (2) defendants' lack of necessary documents and inadequate community placement options created a sizeable backlog to discharge; and (3) hospital accreditation standards prevented the Department from increasing the number of beds quickly to meet the growing demand.

*Lack of Capacity*

Mr. Mroz testified that in 2017, in response to substantial delays in admission, the Department created a centralized admission process, which enabled the Department to

---

[3] A hospital warrant is a "legal document issued by a court that … authorizes any law enforcement officer in the State to apprehend a person who is alleged to have violated an order for conditional release and transport the person to a facility designated by the Health Department[.]" CP § 3-101(e)(1).

6

timely admit IST defendants.[4] However, "a spike in [commitment] orders" after the COVID-19 pandemic outpaced the Department's efforts to eliminate admission inefficiencies. According to Mr. Mroz, the total number of court commitment orders in 2019 was approximately 750. During the COVID-19 pandemic, that number decreased to around 600 in 2020; it was back up to approximately 700 in 2021. In 2022, the Department received approximately 860 court commitment orders; the number increased to 1,100 in 2023.

*Obstacles to Discharge*

Although there were "right around 100" individuals clinically ready to be discharged at the time of the hearing, Mr. Mroz said that the Department could not timely discharge them to free up their beds for new admissions from the waiting list. Some of the individuals ready for discharge lacked appropriate documents such as a driver's license, birth certificate, or social security card, which prevented the Department from securing private community placements for them after discharge. To reduce the discharge backlog, the Department created "a linkage to MDOT," and hired outside lawyers to assist individuals with procuring the necessary documents. Mr. Mroz could not provide data on

---

[4] Before 2017, there was no centralized database to monitor bed availability across designated health care facilities. *See State v. Crawford*, 239 Md. App. 84, 107 (2018). Mr. Mroz explained that "every court order went to all the hospitals," and the Department had to "negotiate around to see if there was a bed[,]" even if an order mandated placement at a particular facility. Under that system, "court orders often were ranked based on which judge 'yelled the loudest.'" *Id.*

how many out of the approximately 100 individuals ready for discharge were held up because they lacked the necessary documents.[5]

In addition to the lack of documentation, Mr. Mroz explained, many community providers, such as residential rehabilitation programs, nursing homes, and assisted living facilities lacked sufficient resources to operate at full capacity. Without private community placements for continued care and treatment, the Department could not discharge individuals even if they were clinically ready for discharge. According to Mr. Mroz, the Department was "working with [community providers] every day … to build up the capacity … [and] funding." The Department also launched pilot programs to transfer individuals from the five adult psychiatric hospitals to the Department's long-term care facilities, and to allow community providers to come onsite at state hospitals to get a head start on the discharge process.

*Acuity and Other Considerations Affecting Waiting List Position*

Mr. Mroz testified that the Department could not simply move individuals up the waiting list to comply with the statutory time limit because doing so would contravene clinical judgments about the relative acuity of the people waiting for placement. Under the

---

[5] According to data that the Department has made publicly available, as of May 2023, five of the 153 individuals (3.27%) ready to be discharged lacked documentation. *See* Maryland Dep't of Health, Comm'n on Behavioral Health Care Treatment and Access, *Criminal Justice-Involved Behavioral Health Workgroup Presentation*, at 10 (Dec. 8, 2023), available at https://perma.cc/RSD8-BPL3. As of September 12, 2024, two of the 119 individuals (1.68%) waiting to be discharged were in that category. *See* Maryland Dep't of Health, Criminal Justice-Involved Behavioral Health Workgroup & Criminal Justice Forensic Subcomm., *Presentation of Overview of MDH Psychiatric Facilities and Current Trends,* at 21 (October 1, 2024) ("Oct. 1, 2024 Presentation"), available at https://perma.cc/TA46-AJJ3.

Department's acuity-focused approach, "the more sick they are[,] the higher they are on the waiting list[.]" Mr. Mroz elaborated that the determination of a defendant's acuity for purposes of positioning on the waiting list is a "clinical decision[] made in conjunction with the detention centers and the clinicians within" the Department, based on a host of factors such as suicidal or homicidal ideation, physical and somatic conditions, whether the individual is in compliance with medication, and the detention center's ability to handle that particular individual's acuity. According to Mr. Mroz, because state and federal accreditations define the standards of care at designated health care facilities, the facilities risked losing the accreditations, licensure, and funding necessary to remain in operation if the Department adjusted the waiting list order without regard to acuity.

Mr. Mroz testified that the Department also gives priority to defendants based on the "type of charges" that are pending against them.[6] In addition, Mr. Mroz explained, the Department prioritizes those individuals who are the subject of hospital warrants.[7]

---

[6] At the Baltimore County hearing discussed below, Mr. Mroz elaborated that "we look at the timing of their … Court case. We look at the charges against them and if they would time out." Under CP § 3-107, the court must dismiss the charge against a defendant found incompetent to stand trial after expiration of a specified period of time. For a defendant charged with a felony or a crime of violence (as defined in section 14-101 of the Criminal Law Article), that period is the lesser of five years or the maximum sentence for the most serious offense charged. CP § 3-107(a)(1). For a defendant charged with any other offense, the period is the lesser of three years or the maximum sentence for the most serious offense charged. *Id.* § 3-107(a)(2).

[7] At the Baltimore County hearing discussed below, Mr. Mroz testified that individuals apprehended under hospital warrants receive top priority: "Hospital warrants come back immediately…. [A]s fast as I can get a bed, they would get that bed."

*Mr. Boulden's Tentative Admission Date*

At the time of the hearing on April 5, 2024, according to Mr. Mroz, Mr. Boulden had a tentative admission date of April 8, 2024, to Eastern Shore Hospital Center ("Eastern Shore"). Mr. Mroz testified that the clinicians did not mention that Mr. Boulden's acuity "was severe or would cause him to move up the waitlist." Mr. Mroz was unable to provide Mr. Boulden's exact number on the waiting list, but explained that if there were others ahead of Mr. Boulden on the list, they might be assigned to beds at other facilities. Mr. Mroz also was unable to say whether or what operational limitations were currently preventing Eastern Shore from discharging any individuals who were ready for discharge.

Mr. Mroz testified that the tentative admission date of April 8 meant that the Department expected a bed to become available that day at Eastern Shore. However, he explained that Mr. Boulden's admission could be delayed beyond April 8 if there was an issue with the discharge of the patient leaving that bed, or if someone apprehended under a hospital warrant needed to be placed at Eastern Shore. In addition, if there was "a sudden decompensation of somebody who's highly acute, we may have to put that person in that bed."

*Difficulty in Expanding Capacity Quickly*

Responding to questions from the Department's attorney, Mr. Mroz testified that the Department has been attempting to add more beds to the system. He explained that the Department has added beds at Spring Grove Hospital Center and Springfield Hospital

10

Center,[8] and that it has plans underway to expand maximum security beds at Clifton T. Perkins Hospital Center ("Perkins"). Further, the Department was developing a "master services plan" to "address all those needs in the next … 10 to 20 years as we move forward." Presently, however, the Department did not have enough beds to keep pace with demand. Mr. Mroz also explained that accreditation requirements prevent the Department from taking stopgap measures such as putting beds in hallways or renting space in hotels.

*Effect of a Sanction*

When asked whether the imposition of sanctions would induce the Department to comply with the order to commit Mr. Boulden, Mr. Mroz replied, "[N]o. I mean, we are spending millions of dollars trying to resolve this waitlist. I cannot imagine any fine – there's nothing that would help us move faster. We're moving as fast as we can." He emphasized that the Department had not willfully violated Mr. Boulden's commitment order: "We're very much aware of it. We're working as hard as we can to comply and get them in as quickly as we can. In his case we're watching it every day …, every chance we can get to move through that waitlist we take." When asked if there is "an ability, an

---

[8] In its February 7, 2018, letter opposing the passage of S.B. 233, the bill that added the 10-day deadline and sanctions mechanism to CP § 3-106, the Department stated that the total number of beds across its five psychiatric facilities was 977. At a hearing in another case in February 2023, Mr. Mroz testified that the total number of beds was 1,056. The Department provided the same figure of 1,056 beds at the April 5, 2024, hearing regarding the placement of Mr. Boulden, the two hearings regarding the five other Respondents on May 8, 2024 and July 9, 2024, and in its opening brief filed in this Court on November 3, 2025. The Department did not mention any new beds having come online at oral argument in this Court on January 6, 2026. Thus, it appears that, since February 2018, the Department has added a total of 79 beds, representing a total increase in capacity of 8.09 percent with zero beds added for at least two years and 11 months prior to the oral argument in this case.

opportunity, to comply with the Court's order[,]" Mr. Mroz replied: "I have no ability at this point. With a 202 [person] waitlist we are getting to the most acute and the most needed patients first in the best way we can."

*The Court's Ruling*

Judge Murphy did not find a willful violation on the part of the Department. Nevertheless, he decided to impose a sanction. Judge Murphy explained that to find a violation of CP § 3-106(c)(2), the "Court only needs to find that the Department failed to admit an individual deemed IST and dangerous into a designated facility within the statutory 10-day period." Thus, Judge Murphy observed, "it is sort of like a strict liability standard in that context, and it has clearly been established by the record and the testimony that the order was issued and that the Department has failed to admit Mr. Boulden within the 10 days." He continued:

> So the Court believes that it is appropriate to apply, or impose sanctions rather, under [CP § 3-106(c)(4)]. The testimony that has been offered today indicates that it costs approximately $600 to $1,000 a day to keep an individual in the hospital.… The Court, therefore, … in an effort to comply with the requirement imposed by that section, that the Court may impose any sanction that is reasonably designed to compel compliance, the Court is going to impose a sanction of $2,000 per day starting today. The purpose of that sanction being to double the cost to the Department through their failure to comply with the statute, thereby hopefully incentivizing them to comply with the statute.

(Paragraph break omitted).

The Department admitted Mr. Boulden to Eastern Shore on April 11, 2024, six days after the hearing. At $2,000 per day, the sanction imposed on the Department in Mr. Boulden's case presumably amounted to $12,000.

12

## B. Messrs. Hawkins, Lomax, Goins, Jackson, and Kauffman (Baltimore County Circuit Court)

Messrs. Hawkins, Lomax, Goins, Jackson, and Kauffman were charged in criminal cases filed in the Circuit Court for Baltimore County. The court subsequently found these Respondents to be IST and issued commitment orders. After the Respondents sought relief for the Department's failure to timely admit them to designated facilities, the Honorable Nancy M. Purpura held a joint hearing on their motions on May 8, 2024. By that date, the Department had admitted Messrs. Hawkins and Goins. Mr. Hawkins's commitment order was issued on January 26, 2024; he was admitted on April 3, 2024. Mr. Goins's commitment order was issued on November 3, 2023; he was admitted on May 6, 2024.

As of the hearing on May 8, 2024, the Department had not yet transferred the other three Baltimore County Respondents. The court issued the commitment orders with respect to Messrs. Jackson, Kauffman, and Lomax on November 6, 2023, December 11, 2023, and March 13, 2024, respectively.

### *Mr. Mroz's Testimony*

The Department again called Mr. Mroz as its only witness.[9] Mr. Mroz's testimony at the Baltimore County hearing was largely consistent with the testimony he gave at the hearing in Mr. Boulden's case.[10] He testified about the emphasis the Department places on

---

[9] Respondents called two employees of the Baltimore County Department of Corrections as witnesses at the hearing.

[10] The transcript of the Baltimore County hearing quotes Mr. Mroz as testifying that, as of the morning of the hearing, the waiting list contained 202 individuals, "with 800 hospital warrants." We assume that "800" is a typographical error. The transcript of the hearing in Mr. Boulden's case quotes Mr. Mroz as stating that he believed there were five

acuity in determining a defendant's position on the waiting list, which he said "really impacts the list more than anything else because we're a hospital[.]" Mr. Mroz also testified about the systemic difficulties the Department confronted in complying with the statutory deadline. He said that he "[could not] imagine" that any monetary sanctions would compel compliance when the Department was already "trying to do everything [it] can to get in compliance" by "spending huge amounts" and committing "thousands and thousands of man hours working on this." He also proffered that he could not "imagine a fine that would … overrule [the Department's] clinical decision."

Mr. Mroz testified that the five Respondents were not admitted within 10 business days of their commitment orders because he "did not have a bed available for them." However, when asked about the specific circumstances preventing the Department from admitting Messrs. Jackson, Lomax, and Kauffman sooner, Mr. Mroz provided little information. He testified that neither Mr. Lomax nor Mr. Kauffman presented high acuity that would move them up the waiting list. The Department had no tentative admission dates for either of those Respondents, and Mr. Mroz did not explain why that was the case. At that point, Mr. Kauffman had been waiting for admission to a designated facility for more than 130 days beyond the statutory deadline.

Mr. Mroz testified that Mr. Jackson's tentative admission date was the next day, May 9, 2024. Although Mr. Jackson had presented an indicator of acute illness at the

---

hospital warrants open as of the preceding evening, April 4, 2024. We also note that, according to a publicly available MDH document, "[a]s of September 24, 2024, the MDH Court-Ordered Hospital Waitlist has 195 individuals with an additional *two* hospital warrants." Oct. 1, 2024 Presentation, at 17 (emphasis added).

14

Baltimore County Detention Center, Mr. Mroz did not say that this circumstance had any effect on Mr. Jackson's position on the waiting list. Rather, Mr. Mroz explained that, despite the indication of acuity, a clinician at the detention center opined that Mr. Jackson could be "safely maintained" there. When Judge Purpura asked what "safely maintained" meant, Mr. Mroz answered that he did not "have that definition exactly with [him]" and that he did not want to make any assumptions about what the clinician meant in using that term. Nor was Mr. Mroz able to identify the clinician at the detention center who said that Mr. Jackson could be safely maintained. As of the date of the hearing, Mr. Jackson had been waiting for transfer to a designated health care facility for almost 170 days beyond the statutory deadline.

*The Court's Ruling*

With respect to Mr. Hawkins and Mr. Goins, the Department argued that no monetary sanctions would reasonably compel compliance because the Department had "already complied in those cases" by transferring those Respondents prior to the hearing. Judge Purpura disagreed, reasoning that the Department did not actually comply with the 10-day time limit, even if the Department had admitted Messrs. Hawkins and Goins before the hearing. She explained that the Appellate Court's decision in *Maryland Department of Health v. Myers*, 260 Md. App. 565 (2024), requires only two factual findings before the imposition of sanctions: first, that the individual was deemed IST by the court, and second, that the Department failed to place the IST individual within 10 business days of receiving the court commitment order. Because both of those circumstances were the case with respect to Messrs. Hawkins and Goins, Judge Purpura rejected the Department's argument

15

that their transfer before the hearing meant that she no longer had authority to sanction the Department for its noncompliance.

Judge Purpura then discussed the course of events since the General Assembly amended CP § 3-106 in 2018. First, she noted that the "statute was revised in 2018 as a result of the very problems that we're attempting to address today." After quoting the preamble to Senate Bill 233 to ascertain the General Assembly's purpose in amending the statute – i.e., to prevent the continued unlawful housing of IST defendants in detention centers – Judge Purpura concluded from the evidence introduced at the hearing that "the problem is ongoing." Judge Purpura continued: "So, the Legislature gave the Court the tool of a sanction to coerce compliance on the part of the Department. So, what has happened since then? Well, the problem existed for many years prior to 2018, but since 2018, the Department really has not made sufficient efforts … to address the problem.… [A]t the very earliest, the Department didn't even start engaging in talks to deal with some of these things until 2020." Judge Purpura commented that "the mere fact that efforts weren't made in 2018 to start to address the problem in itself, cries out for a sanction."

Judge Purpura rejected Mr. Mroz's testimony that monetary sanctions would not compel compliance. Without "suggesting that anybody is … not being truthful in terms of their belief," Judge Purpura stated that she did not credit the testimony "for a number of reasons."

First, Judge Purpura was of the view that the Department previously had little incentive to address its chronic delay in placing IST individuals at designated facilities. She recounted that prior to 2018, there was no statutory time limit within which the

16

Department had to secure bed placements for IST individuals. Eventually, "the Legislature came to the conclusion that it was necessary to give [the] Court the authority to impose these sanctions." After the General Assembly enacted the 10-day statutory limit in 2018, however, it became apparent that a civil contempt proceeding was an inappropriate vehicle for courts to sanction the Department. The Department had never actually had to pay any sanctions; any sanctions imposed through civil contempt proceedings were all reversed on appeal. In light of *Myers*, Judge Purpura believed that a monetary sanction was reasonably designed to compel compliance "once the Department is made to understand that they will have to pay the monetary sanction." Judge Purpura commented earlier in the hearing that "[i]t would be … beyond the level of sanity on the part of the Department to consistently be hit with monetary sanctions and not be incentivized to do anything." She "also believe[d] that, … as the numbers [of commitment orders] have increased, … a monetary sanction for each one of these cases is going to coerce compliance." Judge Purpura concluded: "I believe that it is reasonably designed, designed to compel compliance. I don't think we would need to incarcerate anyone to compel compliance" because "if a monetary sanction doesn't do it, what will?"

Judge Purpura announced that she would impose "a sanction that is based on the number of days exceeding the 10-day time limitation that the person remained in the Detention Center," and decided that the sanction would be $1,000 per day for that period of time in all five cases. She stated that she would impose the following sanctions with respect to the five Respondents:

Mr. Lomax: $46,000
Mr. Hawkins: $67,000
Mr. Goins: $182,000
Mr. Johnson: $174,000
Mr. Kauffman: $139,000

On May 9, 2024, Judge Purpura entered written orders imposing sanctions on the Department in the above amounts with respect to Messrs. Lomax, Hawkins, Goins, and Johnson. The orders directed the Department to deposit those amounts "into the Registry of the Court within 15 days of the docketing of this Order pending further proceedings."[11]

*The Second Hearing in Mr. Kauffman's Case*

With respect to Mr. Kauffman's case, on May 10, 2024, Judge Purpura reconsidered and struck without prejudice the sanctions she had orally announced at the conclusion of the May 8 hearing. Judge Purpura took this action because Mr. Kauffman, unlike the other Baltimore County Respondents, had filed a petition for contempt rather than a motion for sanctions.

Mr. Kauffman subsequently filed a motion for sanctions. The parties filed a joint motion requesting that the court incorporate all testimony and arguments presented at the previous hearing, forego a second hearing, and reinstate the sanctions previously imposed.

---

[11] Counsel for four of the Respondents asked Judge Purpura, "who does this money get paid to?" Judge Purpura replied that she was not ordering reimbursement of the Baltimore County Detention Center. Counsel then requested that the court "tailor the judgment to be to Baltimore County … so that it can be used for mental health services here for our people in Baltimore County[.]" Judge Purpura asked the parties to provide additional papers concerning to whom the funds should be directed. At the second hearing in Mr. Kauffman's case discussed below, Judge Purpura stated that "there was an agreement between [the Department's counsel], and the Defense and the Court that the money would go to the Baltimore County Department of Health."

Judge Purpura denied the joint motion, explaining that "[a]ny efforts made by the Department to comply with the statute since the last hearing are relevant to the appropriateness of a sanction." Judge Purpura held a second hearing in Mr. Kauffman's case on July 9, 2024.

*Testimony of Ami Tibbett*

Mr. Kauffman called Ami Tibbett, Acting Director of the Department's Office of Court Ordered Evaluations and Placements, as a witness at the second hearing. When asked what the Department had done since the May 8 hearing to transfer Mr. Kauffman, Ms. Tibbett replied, "We haven't done anything, in addition to what we've been doing prior, up until that time, which is … managing our waitlist, … monitoring our defendants for acuity …, and just trying to get our defendants placed as quickly as possible." Judge Purpura then asked Ms. Tibbett: "So, you've not taken any steps to either free up beds? Or to procure additional beds in other facilities? Or perhaps, take steps to um, have the legislature approve … funding for an additional hospital? You've done nothing like that?" That led to further testimony by Ms. Tibbett similar to the testimony Mr. Mroz provided at the earlier hearings about the Department's efforts to create more capacity. Judge Purpura observed that information concerning the Department's plans to create new beds was "important for the Court's consideration with regard to what, if any, additional sanction is necessary."

Ms. Tibbett testified that Mr. Kauffman at that time was third on the waiting list to be admitted to Perkins "by date of Order." Ms. Tibbett explained that Mr. Kauffman's

admission to Perkins could be delayed due to execution of a hospital warrant; the only thing that might speed up his admission was "decompensation of his acuity."

Ms. Tibbett provided more information about how the Department tracks detainees' acuity:

> Every 2 weeks, our Central Admissions Office sends a … pretty much a … form letter/e-mail to all of our detention centers listing the defendants that they have … on our waitlist,-- … and there is a series of questions that are asked-- … of the detention centers…. It typically goes to their clinical … to their medical-- whoever … is designated to receive those. There's usually a nurse's station…. [I]t is a form letter that has a list of several questions …. [S]ome of the questions that they ask [are:] [I]s … the defendant … having suicidal ideation? Is the defendant being compliant with their medications? Is the defendant eating? Sleeping? … [G]rooming appropriately? That's the type of questions. I believe there's about 7 or 8 questions on that form letter.

According to Ms. Tibbett, Mr. Kauffman's last acuity check had occurred on June 27, 2024. At that time, there were six detainees who "were mentioned as being acute," and Mr. Kauffman was not among them.

*Arguments of Counsel*

After Ms. Tibbett concluded her testimony, Mr. Kauffman's counsel and the Department's counsel presented arguments. Mr. Kauffman's counsel stated that while he was "thrilled to hear Mr. Kauffman is number 3 on the waiting list, … in terms of what the Department has done from May 8th up through today, differently from what they had done previously, it really doesn't sound like they have done anything different. It sounds like there's some great ideas about breaking ground or some projects that may happen in 2025, um, some extra beds that may be added, but that doesn't help Mr. Kauffman."

20

Counsel for the Department argued that, under Article 8 of the Maryland Declaration of Rights, imposing a sanction in the circumstances presented would violate Maryland's constitutional separation of powers. According to the Department, by "forcing us to comply and admit people by Court Order date versus acuity changes our entire hospital system to being one that cares for the sickest patients first like all hospitals do, into one where we are instead … just looking at dates for a Court Order[.]"

Counsel for the Department requested that any sanctions ordered by the court run "starting today and not going back to December[.]" In response to Judge Purpura asking why she should do that, counsel answered, "based on the efforts that we are undertaking, we have an active procurement process underway to hire contractors and subcontractors to start construction."

*The Court's Ruling*

Responding to the Department's argument that its construction plans warranted a lesser sanction, Judge Purpura stated:

> I know that procurement for any government agency is always a lengthy process because of all the checks and balances and things that have to take place, including, you know, Legislative approval and that sort of thing. But this really does seem – if there really was a concerted effort being made, it would seem to me that that may have happened a long time ago…. I don't see anything that's changed really with respect to how the Department has been handling these things. You know, a Court Order is a Court Order, and while the Department has an obligation, I suppose, ethically, to admit the most seriously ill patients, that doesn't change the requirements of the statute. And the length of time that this individual has been languishing in a prison, as opposed to in a hospital, is, quite frankly, outrageous and a clear violation of the statute.

In addition, Judge Purpura did not find "any evidence of some inability on the part of the Department to comply with the statute based on the fact that they have been able to continue to admit patients and that the issues that caused them to have problems with bed space are long-standing and have not been adequately addressed. But regardless, the statute permits a sanction that is designed to encourage compliance and I believe that … this is sufficient to do that."

Consistent with her rulings in the other four Baltimore County cases, Judge Purpura stated that she would impose a sanction of $1,000 per day "subsequent to the Court's Order committing [Mr. Kauffman] to the hospital." In her written order, issued on July 9, 2024, Judge Purpura imposed a sanction of $195,000. As was the case with the other four orders, the order in Mr. Kauffman's case directed the Department to deposit the funds into the Registry of the Court pending further proceedings.

## C. Appeal

The Department appealed the sanctions imposed in all six cases.[12] The Department did not argue in the Appellate Court of Maryland that the sanctions orders in Respondents' cases violated Maryland's constitutional separation of powers. The Department argued only that the sanctions orders were not reasonably designed to compel compliance with CP § 3-106's 10-day deadline. *Maryland Dep't of Health v. Boulden*, 266 Md. App. 39, 90

---

[12] The Department's appeals in Respondents' cases were consolidated at the Appellate Court, along with the Department's appeal in *Maryland Department of Health v. Jermell Savage*, a Dorchester County case. Mr. Savage's case is not before us.

(2025). The Appellate Court affirmed Judge Murphy's and Judge Purpura's respective sanctions orders.

The Appellate Court explained that "[t]he imposition of sanctions pursuant to CP § 3-106(c)(4), unlike in a contempt case, does not require a finding of willfulness; the statute permits sanctions based on a mere failure to comply with the 10-day deadline, if the sanctions are 'reasonably designed to compel compliance.'" *Id.* at 89 (cleaned up). The Court observed that § 3-106 does not define the phrase "reasonably designed to compel compliance." *Id.* at 92. The Court determined that, "[t]o the extent that this term is ambiguous, the legislative history makes clear that the legislature was frustrated by delays in admissions to Department facilities, and its intent was to impose a deadline for admission, with sanctions to enforce compliance with the statutory mandate." *Id.* With respect to all Respondents' cases, the Appellate Court concluded that the circuit courts did not abuse their discretion in concluding that the sanctions would lead the Department to comply with the statute. *See id.* at 97-99.

The Appellate Court further held that the placement of Messrs. Hawkins and Goins before the hearing did not prohibit Judge Purpura from imposing sanctions under § 3-106(c)(4). *Id.* at 100-01. The court reasoned that a contrary holding would frustrate the General Assembly's intent to allow for reimbursement of a detention center for costs incurred in housing defendants who should have been placed in a Department facility. *Id.* at 100. The Department's interpretation also "could lead to a situation where the Department admits a defendant the day before a motions hearing to avoid sanctions, even if there has been an extensive delay in admission beyond the statutory deadline." *Id.* The

23

Court reasoned that this "would frustrate the legislative intent in enacting CP § 3-106(c)(4), i.e., to hold the Department accountable for unacceptable delay in admitting defendants deemed IST and dangerous." *Id.*

The Appellate Court held that because the Department does not violate § 3-106(c)(2)(i) until it exceeds the 10-day deadline for admitting a defendant, the statute should be construed "to authorize the calculation of daily sanctions beginning on the 11th business day after the date of the commitment order." *Id.* at 102. In the cases of Messrs. Lomax, Jackson, Goins, and Hawkins, Judge Purpura imposed daily sanctions beginning as of the dates of those Respondents' commitment orders. *Id.* The Appellate Court reversed the sanctions orders in those cases and directed remands for recalculation of the amounts. *Id.* at 102-04. The Appellate Court affirmed the sanctions orders in Mr. Boulden's and Mr. Kauffman's cases. *See id.* at 104-05 & 104 n.30.

We granted the Department's petition for certiorari, *Maryland Dep't of Health v. Boulden*, 492 Md. 412 (2025), agreeing to review two questions that we have rephrased as follows:

1. Did the circuit courts abuse their discretion by imposing monetary sanctions that were not reasonably designed to compel the Department to comply with CP § 3-106(c)(2)(i)?

2. May a court impose sanctions under CP § 3-106(c)(4) where the Department has already admitted a defendant to a designated health care facility?

After the consolidated appeals were argued on January 6, 2026, we invited the parties to provide supplemental briefing on the following question: "In imposing monetary sanctions against the Department of Health in these cases, did the circuit courts violate

24

Article 8 of the Maryland Declaration of Rights?" The parties subsequently submitted supplemental briefs and supplemental response briefs.

## II

## Standard of Review

We review the decision to award sanctions under CP § 3-106(c)(4) and the amount of sanctions awarded for abuse of discretion. *Myers*, 260 Md. App. at 628. We review the trial court's evidentiary findings for clear error. *Id.*

We review questions involving the interpretation of statutes and the Maryland Constitution de novo. *See SM Landover, LLC v. Sanders*, 489 Md. 614, 632 (2025); *Mayor & City Council of Ocean City v. Comm'rs of Worcester Cnty.*, 475 Md. 306, 311-12 (2021).

## III

## Discussion

The Department's chronic delay in placing IST defendants at designated facilities for treatment and restoration of competency is well-documented in case law and legislative materials. The General Assembly was explicit in what the 2018 amendment to CP § 3-106 was meant to achieve. The cross-filed bills that included the new sanctions provision stated in the preamble that the conclusion in *Powell* that courts lacked authority to set a deadline for admission was "contrary to the intent of the General Assembly," and that "[s]eriously mentally ill and incompetent defendants will continue to be unlawfully housed in detention centers unless the courts have authority to impose deadlines to enforce court orders[.]" 2018 Md. Laws, ch. 188 (H.B. 111), preamble; 2018 Md. Laws, ch. 189 (S.B. 233), preamble. In amending CP § 3-106, the General Assembly created a uniform 10-business-

25

day deadline to admit an IST defendant and, in the event the Department failed to comply with that deadline, the General Assembly authorized a court to impose sanctions to compel the Department to place the defendant as soon as possible thereafter.

We conclude that the circuit courts did not abuse their discretion in imposing sanctions in Respondents' cases. The General Assembly has authorized trial judges to impose monetary sanctions that are reasonably designed to compel the Department to admit the defendants before them to designated health care facilities as soon as possible after the expiration of the 10 business-day deadline. If there is a waiting list for placement, a court may sanction the Department for every day that it does not manage the waiting list so as to admit the defendant as soon as possible beginning on the eleventh business day following receipt of the defendant's commitment order. The record demonstrates that the sanctions in Respondents' cases were reasonably designed to compel such compliance. In addition, we agree with the Appellate Court that the placement of Messrs. Hawkins and Goins before the hearing did not prohibit Judge Purpura from imposing sanctions.

The Department waived its arguments based on Article 8 of the Declaration of Rights. Regardless, the Department's separation of powers arguments lack merit. The General Assembly did not violate Article 8 in authorizing courts to impose sanctions under CP § 3-106(c)(4). In imposing sanctions in Respondents' cases, Judge Murphy and Judge Purpura did not usurp the functions of the Executive Branch.

**A. The Circuit Courts' Sanctions Orders Were Reasonably Designed to Compel the Department to Admit Respondents As Soon As Possible.**

The Department argues that the circuit courts abused their discretion in imposing the sanctions in Respondents' cases. The Department contends that the sanctions orders were not reasonably designed to compel compliance with the 10-day deadline because the "undisputed" evidence before the courts demonstrated that it was impossible for the Department to meet that deadline with respect to Respondents. Specifically, the Department points to evidence of the long waiting list to admit IST defendants and to Mr. Mroz's testimony that no sanction would compel the Department to abandon its policy of managing the waiting list primarily based on acuity. Given this evidence, the Department contends that the courts did not impose sanctions to compel the Department to admit Respondents within the statutory 10-day period or as soon as possible thereafter. Rather, the courts must have intended: (1) to spur the Department to make systemic changes (such as building new hospitals to increase capacity); (2) to punish the Department for not having already made the necessary systemic changes; or (3) to force the Department impermissibly to abandon clinical standards in admitting patients.

Respondents disagree with the Department's contention that it was undisputed that monetary sanctions would not compel the Department to prioritize Respondents for admission. In addition, Respondents observe, the circuit courts were free not to credit – and, in fact, did not credit – Mr. Mroz's testimony that no monetary sanctions would compel compliance. Respondents assert that the sanctions were reasonably designed to compel their admission. To the extent the circuit courts considered systemic concerns in

determining whether to impose sanctions, Respondents argue that the courts were permitted to do so. Further, Respondents argue that neither the plain language of CP § 3-106 nor its legislative history supports the proposition that the expanding size of the waiting list for admission may effectively freeze the ability of courts to impose monetary sanctions.

In order to assess whether the circuit courts abused their discretion, we first must determine the circumstances in which CP § 3-106(c)(4) authorizes a court to sanction the Department.

The goal of statutory interpretation is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). In conducting this inquiry, "we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (internal quotation marks and citations omitted). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). We "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor &*

*Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006). We do not "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. We presume "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* To the extent there is ambiguity in statutory language, we strive to resolve it by "searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. *See, e.g.*, *In re O.P.*, 470 Md. 225, 255 (2020). Further, we "check our interpretation against the consequences of alternative readings of the text[,]" *Bell v. Chance*, 460 Md. 28, 53 (2018), which "grounds the analysis." *In re O.P.*, 470 Md. at 255. Doing so helps us "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Mayor & Town Council of Oakland*, 392 Md. at 316; *see also Bell*, 460 Md. at 53 (explaining that, throughout the statutory interpretation process, "we avoid constructions that are illogical or nonsensical, or that render a statute meaningless").

1. <u>Monetary Sanctions Imposed Under CP § 3-106(c)(4) Must Be Reasonably Designed to Compel the Department to Admit the Particular Defendant Before the Court to a Designated Facility As Soon As Possible After Expiration of the 10-Day Period.</u>

The Department contends that a court may not impose monetary sanctions to compel the Department to make systemic changes, such as building more hospitals or otherwise expanding capacity in the future. Rather, a sanction must be reasonably designed to compel the admission of the particular defendant before the court to a designated health care facility. We agree.

The statute provides: "If the Health Department fails to admit a defendant to a designated health care facility within [10 business days from the Department's receipt of the defendant's order of commitment], the court may impose any sanction reasonably designed to compel compliance[.]" CP § 3-106(c)(4). The statute links "compliance" to the Department's failure "to admit a defendant." The statute says nothing about sanctioning the Department for its failure to build enough hospitals or otherwise secure more beds for placement of IST defendants. The plain language of the statute requires that a court impose a sanction under § 3-106(c)(4) only for the purpose of compelling compliance with respect to the particular defendant before the court – i.e., admitting the defendant to a designated facility.[13]

However, this determination begs another question: compliance by when? The Department contends that monetary sanctions cannot reasonably compel compliance where

---

[13] However, as discussed below, a court may consider the Department's approach to systemic issues in deciding whether to exercise its discretion to impose a monetary sanction and, if so, the amount of that sanction.

a court is unable to find that the Department has "sufficient capacity to place all, most, or even many court-committed individuals within 10 business days of the date the Department received the commitment order." But the 10-day period must have already expired for a court to have the authority to impose a sanction. The "compliance" to be compelled, therefore, must be something other than placement within 10 business days.[14]

The plain language of § 3-106(c)(4) does not expressly provide a time for compliance to which a sanctions order may be geared. One possible interpretation is that the General Assembly intended court-ordered sanctions to compel the Department's compliance on the eleventh business day. The General Assembly determined that, without an enforcement mechanism, "[s]eriously mentally ill and incompetent defendants will continue to be unlawfully housed in detention centers[.]" 2018 Md. Laws, ch. 188 (H.B. 111), preamble; 2018 Md. Laws, ch. 189 (S.B. 233), preamble. Under § 3-106 as amended, an IST defendant who is not admitted to a designated facility becomes unlawfully housed in a detention center beginning on the eleventh business day after the Department receives the defendant's commitment order. Thus, one can plausibly conclude that the Department intended to give courts the authority to compel compliance on the eleventh business day.

However, an alternative interpretation is that the General Assembly intended to coerce compliance as soon as possible after expiration of the 10-day period. There had been fluctuations in the waiting list for placement before 2018, and nobody could predict with

_____

[14] The prospect of sanctions starting on the eleventh business day presumably encourages the Department to admit defendants within the 10-day period where it is possible to do so.

any certainty what the future demand for such placements would be. The General Assembly likely anticipated that, going forward, even with improved processes and the Department's best efforts, there might be times when there would not be enough beds available to admit every IST defendant by the eleventh business day. This supports the proposition that the General Assembly authorized sanctions to compel the admission of every IST defendant as soon as possible, rather than on the eleventh business day.

The legislative history does not resolve the ambiguity. In our view, the more reasonable interpretation is that a court is authorized to impose sanctions to compel the Department to admit a defendant to a designated facility as soon as possible after expiration of the 10-day period. The General Assembly surely did not intend courts to impose sanctions to compel the Department to achieve the impossible. *See Williams v. State*, 492 Md. 295, 308 (2025) ("In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.") (citation omitted).

2. The Circuit Courts' Sanctions Orders Were Reasonably Designed to Compel the Department to Admit Respondents As Soon As Possible.

The Department contends that, in imposing sanctions, the circuit courts intended to compel systemic reform. The Department claims this must be the case because Mr. Mroz gave "undisputed" testimony that monetary sanctions would not override the Department's clinical decision making. Initially, we agree with Respondents that defense counsel in fact disputed Mr. Mroz's position that no sanction would compel the Department to admit

32

Respondents more quickly than the Department would if left to its own devices. Thus, the Department's argument proceeds from a flawed premise.

In addition, CP § 3-106(c)(4) is phrased in terms of the court's state of mind, not that of the Department. The sanction imposed must be "reasonably designed to compel compliance." The designer is the court. If the court concludes, based on the evidence before it, that the Department has not taken available steps to admit the particular defendant before the court as soon as possible, the court may impose a sanction that is reasonably designed to coerce the Department to do so. As discussed below, the evidence before the courts demonstrated that the Department had the ability to manage the waiting list in a way that would result in Respondents being admitted more quickly. That being the case, it was beside the point that Mr. Mroz testified that no sanction would actually cause the Department to do so. The sanction need only be *designed* to compel the Department's possible compliance; it need not ensure such compliance.

In any event, to the extent that Mr. Mroz's testimony that no sanction would compel the Department to comply was relevant to the circuit court's decision whether to impose a sanction, the circuit courts were free not to credit his testimony. Judge Murphy implicitly discredited Mr. Mroz's testimony that the Department had no ability to comply with the commitment order. He stated that the purpose of the daily sanction he was imposing was "to double the cost to the Department through their failure to comply with the statute, thereby hopefully incentivizing them to comply with the statute." Judge Purpura explicitly discredited Mr. Mroz's testimony. We discern no clear error in either court's determination. *See Myers*, 260 Md. App. at 629-30 (rejecting testimony of Department witnesses "that no

33

amount of sanctions would induce compliance because there were 'no beds'"; the court "was not obligated to believe that testimony and had significant discretion to accept – or reject – all, part, or none of the testimony of the witness") (citation modified).

The evidence at the hearings demonstrated that the Department balances the acuity of the individual awaiting placement against other considerations. Those considerations include whether the individual can be safely maintained at a detention center; whether the individual is approaching the "timing out" of their charges; whether the individual is in competition for a bed with someone who was the subject of a hospital warrant; and the date of the individual's commitment order, to the extent it reveals how long an individual has been awaiting placement.

The Department's use of the timing out of charges as a factor in placement on the waiting list is noteworthy. Mr. Mroz testified that "we look at the timing of their … Court case. We look at the charges against them and if they would time out." As noted above, under CP § 3-107, the court must dismiss the charge against a defendant found incompetent to stand trial after expiration of a specified period of time. For example, a defendant charged with a felony or a crime of violence will time out no later than five years after being charged. CP § 3-107(a)(1).

Mr. Mroz testified that the Department also considers "how long somebody has just generally been on the list, because we don't want somebody that – being at the bottom. We have to take that into account also as we move through."

The import of Mr. Mroz's testimony was that, acuity aside, the Department will eventually move a defendant up the waiting list as the defendant approaches the timing-out

date or if, in the Department's judgment, the defendant has been on the list for too long. This undermined Mr. Mroz's claim that he could not "imagine a fine that would … overrule [the Department's] clinical decision." Given that the Department already prioritizes the timing out of charges and overall time spent on the waiting list above acuity in some circumstances,[15] the circuit courts reasonably could conclude that substantial sanctions would compel the Department to prioritize admission of Respondents as soon as possible.

To be sure, in explaining her decision to impose sanctions, Judge Purpura discussed the longstanding nature of the Department's placement delays and the sluggish pace at which the Department has increased bed capacity. However, we do not interpret those comments as indicating that Judge Purpura imposed sanctions to compel systemic reform. First, it was the Department that raised the issue of its efforts at systemic reform by eliciting testimony from Mr. Mroz concerning those efforts and arguing that they militated against the imposition of sanctions. To the extent Judge Purpura indicated that she found the Department's efforts to be too little, too late, that was fair comment given the context. It does not follow that the sanctions Judge Purpura imposed in the aftermath of those

---

[15] Mr. Mroz testified that the Department prioritizes hospital warrants above all other factors in determining waiting list order. As a matter of statutory authority, the Director of the Behavioral Health Administration sets the admission standards for the facilities administered by the Department. *See* HG § 10-407. Those standards are not in the record, and the Department has provided no citations to its admission policy, or to any relevant state and federal accreditation requirements in its briefing or oral argument. The Department also offered no explanation as to why, per the Department's admission standards, a hospital warrant always overrides acuity determinations while the date of an individual's commitment order does not.

comments were designed to make the Department do better in its efforts at systemic reform, or to punish the Department for not having done better in the past.

Second, it was obvious to both Judge Murphy and Judge Purpura that bringing more beds online in the future would not have any effect on Respondents' placements. If either judge had imposed a monetary sanction for every day going forward that the Department did not break ground on a new hospital, this would be a different case. Instead, both courts imposed sanctions based on the number of days Respondents were not admitted to designated facilities. On their face, the sanctions orders were designed to compel the Department to act with respect to Respondents, not to compel the Department to undertake systemic reform.

Third, Judge Purpura made comments such as "since 2018, the Department really has not made sufficient efforts … to address the problem," and "the mere fact that efforts weren't made in 2018 to start to address the problem in itself, cries out for a sanction" while recounting the legislative history of 2018 amendments to § 3-106 and explaining her reasons for discrediting Mr. Mroz's testimony that no sanction would compel the Department's compliance. Contrary to the Department's reading of these statements, the record shows that Judge Purpura found significant that the General Assembly intended to create an effective enforcement mechanism to bring the Department into compliance, and that her application of § 3-106(c)(4) was informed by the course of events before and after 2018.

Fourth, Judge Purpura was permitted to consider the Department's past efforts and future plans with respect to systemic reform in deciding whether to exercise her discretion

to impose sanctions designed to hasten Respondents' admission and the amount of any such sanctions. There is a difference between imposing a sanction for the purpose of spurring systemic reform and considering whether and how the Department's systemic reform efforts bear on the need to take action with respect to an individual defendant. We read Judge Purpura's comments as examples of the latter, as opposed to the former.[16]

The Department argues that, to the extent the sanctions in these cases were not aimed at systemic reform, the courts must have intended to compel the Department to place Respondents ahead of others on the waiting lists.[17] According to the Department, such a sanction cannot *reasonably* be designed to compel compliance because it seeks to compel the Department to abandon clinical standards in admitting patients. The Department's

---

[16] Notably, at the second hearing in Mr. Kauffman's case in July 2024, counsel for the Department argued that Judge Purpura should order any sanctions to run only going forward from the date of the hearing, "based on the efforts that we are undertaking," including "an active procurement process underway to hire contractors and subcontractors to start construction." Thus, the Department's position in the circuit court was that its efforts to build capacity for the future may inform a court's exercise of discretion in the present to impose sanctions under CP § 3-106(c)(4). We agree.

[17] With respect to Mr. Boulden's case, the Department also argues that Judge Murphy did not properly exercise his discretion under CP § 3-106(c)(4) because he was of the view that the 2018 amendments imposed a "strict liability" standard. The Department misunderstands Judge Murphy's remark. Judge Murphy recounted that the Appellate Court's decision in *Myers* stated that to find a violation of the 10-day deadline, a court "only need[ed] to find that the Department failed to admit an individual deemed IST and dangerous into a designated facility within the statutory 10-day period." Judge Murphy did not view the statute as mandating the imposition of a sanction once a violation of the 10-day deadline was established. Rather, Judge Murphy recognized that, under § 3-106(c)(4), a court "may impose any sanction that is reasonably designed to compel compliance." Judge Murphy exercised his discretion to impose a sanction reasonably designed to compel compliance, stating that sanctions would "hopefully incentiviz[e] [the Department] to comply with the statute."

argument is that courts do not act "reasonably" by coercing the Department to admit defendants without regard to acuity. We disagree. "Reasonably," as used in CP § 3-106(c)(4), does not mean that a court must defer to the Department's judgment about the best way to manage the waiting list for placement.[18] Rather, "reasonably" refers to the rationality of the court's "design[]" of the sanction imposed. A sanction's design is reasonable if there is a rational basis to believe that it will compel the Department to admit the defendant before the court as soon as possible. That design may include sanctioning the Department for every day that it does not manage its waiting list for placement such that IST defendants are admitted as soon as possible beginning on the eleventh business day following receipt of their commitment orders.

Finally, the Department argues that, when the General Assembly added the 10-day deadline and sanctions mechanism to CP § 3-106 in 2018, the General Assembly did not anticipate that skyrocketing numbers of commitment orders would lead the waiting lists to go from the more modest numbers of early 2018 to over 200 individuals awaiting placement when the hearings in these cases occurred. That may be. But it is the General Assembly's prerogative, not ours, to further amend the statute in light of changed circumstances. *See Stearman v. State Farm Mut. Auto. Ins.*, 381 Md. 436, 454 (2004) ("We

---

[18] Mr. Mroz testified that complying with the orders would jeopardize the facilities' accreditation and licensure. The Department introduced no other evidence to support its claim, and the courts did not find that sanctions would lead to these outcomes. In any event, we agree with Respondents that "the Department points to nothing in the statute or legislative history that would permit the expanding size of waitlists to effectively freeze the ability of courts to impose monetary sanctions."

will not invade the province of the General Assembly and rewrite the law for them, no matter how just or fair we may think such a new law or public policy would be."). To date, the General Assembly has not done so.[19]

In sum, a court has discretion to impose a sanction under CP § 3-106(c)(4) if the record supports a finding that a sanction is reasonably likely to compel the Department to admit the defendant before the court to a designated health care facility as soon as possible. Evidence that the Department has not managed its waiting list for placement so as to admit the defendant as soon as possible supports such a finding. The record before the courts in Respondents' cases demonstrated that the Department did not manage the waiting list to admit Respondents as soon as possible after the expiration of the 10-day deadline. The courts did not abuse their discretion in deciding to impose sanctions in Respondents' cases.

## B. A Court Does Not Lose Its Authority to Impose Sanctions Under CP § 3-106(c)(4) After the Department Belatedly Admits a Defendant to a Designated Facility.

The Department makes an additional argument with respect to Messrs. Hawkins and Goins. According to the Department, because it admitted those Respondents before the motions hearing, Judge Purpura lacked authority under CP § 3-106(c)(4) to impose any sanctions. The Department contends that the plain language of CP § 3-106(c)(4) prohibits a court from sanctioning the Department after the Department transfers a defendant to a

---

[19] In 2024, H.B. 1346, as introduced, would have amended CP § 3-106 in several respects. Pertinent here, the bill would have increased the deadline to admit an IST defendant from 10 business days to 30 business days. *See* https://perma.cc/7NNU-GJLS. The bill was withdrawn by its sponsors a month after its introduction. No analogous bill was introduced in the 2025 or 2026 legislative sessions.

designated health care facility. According to the Department, it is immaterial that § 3-106(c)(4) expressly includes as a potential sanction "requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond" the 10-business-day period. The Department observes that the statute does not provide that a reimbursement sanction must always be available; it authorizes such a sanction only if "reasonably designed to compel compliance," which the Department says is the case only if a defendant is still housed at a detention center when a court imposes a sanction. The Department relies on cases holding that civil contempt sanctions are intended to compel future compliance and therefore cannot be imposed for past non-compliance or to punish the contemnor.

Respondents counter that it would have been easy for the General Assembly to add language to the statute specifying that sanctions could not be imposed once a defendant has been transferred if that had been its intent. In Respondents' view, the General Assembly's inclusion of reimbursement of detention centers as a potential sanction is significant. They emphasize that the expenses and costs incurred by a detention center for housing an IST defendant do not disappear once the defendant is transferred. In addition, Respondents assert, the legislative purpose underlying the sanctions mechanism would be thwarted if the Department could avoid sanctions by admitting a defendant shortly before the hearing on a defendant's motion for sanctions. In addition, Respondents argue that the Department's analogy to civil contempt is inapt. We again agree with Respondents.

As applied to this question, the phrase "reasonably designed to compel compliance" again is ambiguous. On one hand, the plain language reasonably can be interpreted to mean

40

that a court can impose a sanction only where the defendant has not yet been admitted. After admission of the defendant, on that reading, there is no "compliance" left to "compel."

On the other hand, the inclusion immediately following "compel compliance" of reimbursement of the detention facility for "expenses and costs incurred in retaining the defendant beyond the [10-day deadline]" as a potential sanction can reasonably be read to permit imposition of a sanction both before and after admission. It would be peculiar for the General Assembly to expressly provide for a sanction that would serve to make the detention center whole if that sanction were not available following transfer. Because both readings are reasonable, we conclude that "reasonably designed to compel compliance" is ambiguous as applied to the authority of a court to impose a sanction after the date that a defendant has been admitted to a designated facility.

To resolve the ambiguity, we must "search for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions." *Bennett v. Harford Cnty.*, 485 Md. 461, 486 (2023) (citation modified). We conclude that the General Assembly intended to permit courts to sanction the Department under § 3-106(c)(4) both before and after the belated admission of a defendant. Thus, Judge Purpura had statutory authority to sanction the Department in Mr. Hawkins's and Mr. Goins's cases, despite their transfers before the motions hearing.

Before we get to Messrs. Hawkins and Goins, it is helpful to consider the other Baltimore County Respondents' cases for a moment. As discussed above, § 3-106(c)(4) provides a mechanism for a court to compel the Department to admit an IST defendant as soon as possible after the expiration of the 10-day deadline. With respect to Messrs. Jackson, Kauffman, and Lomax, Judge Purpura had discretion to sanction the Department for each day that it did not manage its waiting list in a way that would admit those Respondents as soon as possible beginning on the eleventh business day following receipt of their respective commitment orders.

With respect to Messrs. Jackson, Kauffman, and Lomax, the Department does not argue that – assuming it was otherwise appropriate to impose sanctions – the court lacked authority to impose daily sanctions going back to the eleventh business day following the Department's receipt of each Respondent's commitment order.[20] The Department is correct not to make that argument with respect to those Respondents. Because the goal of the statute is to compel compliance as soon as possible after the expiration of the 10-day deadline, Judge Purpura was authorized to impose sanctions in the Jackson, Kauffman, and Lomax cases retroactively as to all days those Respondents remained unadmitted starting on the eleventh business day and continuing through the date of admission.

---

[20] At the second hearing in Mr. Kauffman's case, when requesting that Judge Purpura order any sanctions to run from the date of the hearing "and not going back to December," counsel for the Department did not argue that Judge Purpura lacked authority under the statute to order sanctions retroactively. Rather, as noted above, counsel argued that the court should exercise its discretion not to go back to December in light of the Department's efforts to build more capacity.

42

We discern no legislative intent that the statute should operate differently where the Department violates the 10-day deadline but admits a defendant before a motions hearing. We agree with Respondents that it is significant that the General Assembly did not include statutory language stating that sanctions may be imposed only if a defendant is not yet admitted. The express inclusion of reimbursement of detention centers as a potential sanction also is significant for the reasons discussed above.

Most significant, the Department's interpretation would allow it to avoid sanctions in any case by transferring a defendant shortly before the date of the hearing on the defendant's motion for sanctions. This would effectively make the day before the motions hearing date the operative deadline for transfer, thereby frustrating the General Assembly's intent that sanctions coerce the Department to admit defendants as soon as possible after expiration of the 10-day statutory deadline.

In this regard, the legislative history of H.B. 111/S.B. 233 is illuminating. In *Powell*, we ruled in favor of the Department on the IST defendants' statutory claim because the version of CP § 3-106 then in effect did not provide a deadline for admission to a designated facility. 455 Md. at 543. Nor did the statute authorize a court to set such a deadline. *Id.* In the absence of such a deadline, we explained, principles of substantive due process mandate that "[a]ny delay in transferring that defendant to a designated facility pursuant to a commitment order must be reasonable in relation to the purpose of treating the defendant while protecting both the defendant and the public." *Id.* at 550. We opined that whether a period of delay is reasonable with respect to a particular defendant depends on the circumstances of the particular case. *See id.* at 552-55.

The General Assembly was not content to allow courts to set the deadline for transfer on a case-by-case basis. The first version of H.B. 111/S.B. 233 contained a provision requiring the court to specify a deadline for transfer in a defendant's commitment order. Dep't Legis. Servs., *Fiscal and Policy Note – First Reader*, H.B. 111/S.B. 233, at 1 (2018 Sess.). The General Assembly did not enact that provision. Rather, the General Assembly decided to create a uniform deadline by statute. It mandated that the Department place all IST defendants within 10 business days of the commitment order, and if the Department failed to do so, authorized judicial sanctions to coerce the Department to admit defendants as soon as possible thereafter. The General Assembly's response to *Powell* is inconsistent with the proposition that the General Assembly intended the deadline for transfer, in practice, to vary based on when courts decide to schedule motions hearings.

Finally, the General Assembly's decision not to make § 3-106(c)(2) enforceable through a civil contempt process is noteworthy. In addition to requiring courts to set the deadline for transfer, the first version of H.B. 111/S.B. 233 that was introduced would have established a rebuttable presumption of contempt if a defendant was not placed in a facility by the date specified in the court's order. Dep't Legis. Servs., *Fiscal and Policy Note – First Reader*, H.B. 111/S.B. 233, at 1 (2018 Sess.). It also would have required the court to make a contempt finding before the imposition of the sanction, and provided for a contempt fine of up to $160 per day for each violation, in addition to all sanctions and remedies available in civil or criminal contempt proceedings. *Id.* The General Assembly did not include any of these provisions in the version of H.B. 111/S.B. 233 that became law. It opted instead for a statutory deadline and a sanctions mechanism to compel

admission as soon as possible after the deadline has passed. Thus, we agree with Respondents that the Department's analogy to civil contempt sanctions is inapt. Tellingly, when a party is held in constructive civil contempt, the contemnor may negate the contempt by satisfying a purge provision. Sanctions orders issued under § 3-106(c)(4) do not contain purge provisions. We decline the Department's invitation effectively to insert one into the statute.

## C. Separation of Powers

On our own initiative, we invited the parties to submit supplemental briefs addressing whether, in imposing monetary sanctions against the Department in these cases, the courts violated Article 8 of the Maryland Declaration of Rights, which mandates the separation of governmental powers. We conclude that the Department waived any such arguments. In any event, the Department's constitutional arguments lack merit.

1. <u>The Department Waived Arguments Based on Separation of Powers.</u>

Respondents argue that the Department waived their arguments regarding separation of powers. We agree.

The Department argued that the sanctions orders violated separation of powers at one circuit court proceeding: the July 9, 2024 hearing in Mr. Kauffman's case. Judge Purpura gave the argument short shrift, telling the Department's attorney, "that would be something that you would have to take up with a higher authority."

The Department did not take the matter up with a higher authority. In the Appellate Court, the Department did not mention separation of powers with respect to Respondents'

45

cases.[21] Nor did the Department present any question regarding separation of powers in its petition for writ of certiorari or mention separation of powers in its initial briefing.

This is not just a matter of the Department failing to preserve an argument. The Department raised separation of powers in one of Respondents' cases in the circuit court, made a passing reference to separation of powers with respect to another defendant's appeal in the Appellate Court (but not as to Respondents' appeals), and then abandoned the issue entirely. Thus, the Department affirmatively waived its arguments concerning separation of powers. *See, e.g.*, *Savoy v. State*, 420 Md. 232, 240-41 (2011) (distinguishing between waiver and forfeiture, and explaining that waiver is "the intentional relinquishment or abandonment of a known right") (internal quotation marks and citations omitted).

2. <u>We Exercise Our Discretion to Excuse the Waiver.</u>

However, after members of the Court asked questions at oral argument involving separation of powers, we invited the parties to submit supplemental briefing on that subject. Despite the Department's waiver, we exercise our discretion under Maryland Rule 8-131 to address the constitutional arguments the Department raised in its supplemental briefs.

---

[21] In its opening brief in the Appellate Court, the Department made a passing reference to separation of powers in the course of discussing Appellant Jermell Savage's case. In its opinion, the Appellate Court noted that "[t]he Department states in its brief, briefly, that the [circuit] court's comments [about the Department's failure to lobby for more resources] raise 'significant separation-of-powers concerns.' It does not, however, raise that as an issue on appeal. It does not make any argument that [CP] § 3-106(c)(4) … is unconstitutional." *Boulden*, 266 Md. App. at 86 n.22. For those reasons, the Appellate Court declined to "address any issues in that regard." *Id.*

Maryland Rule 8-131(b)(1) provides, in part: "Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Appellate Court or by a circuit court acting in an appellate capacity, the Supreme Court *ordinarily* will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Supreme Court." (Emphasis added). "Ordinarily" signifies that there will occasionally be exceptions to the general rule that we will not consider issues that have not been properly preserved and raised in a petition or cross-petition for writ of certiorari. *See, e.g.*, *Robinson v. State*, 410 Md. 91, 103-04 (2009); *see also Oken v. State*, 343 Md. 256, 273 (1996) ("Under Maryland Rule 8-131, this Court retains discretion to excuse a waiver.").

Even though the Department has waived its constitutional arguments, given our decision to invite supplemental briefing and the possibility that the Department will raise separation of powers arguments in future cases where IST defendants seek sanctions under CP § 3-106(c)(4), it will benefit all concerned to reach the merits of those arguments now.

3. The Department's Arguments Concerning Separation of Powers Lack Merit.

Article 8 of the Maryland Declaration of Rights provides: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." However, this Court "has long acknowledged that the respective powers of the legislative, executive and judicial branches of government are not wholly separate and unmixed[.]" *Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 370 (2022) (internal quotation marks and citation omitted). Indeed, we have explained that

47

[t]he separation of powers concept embodied in Article 8 accommodates the fact that, in addition to the specific powers and functions that the Constitution expressly grants to the three branches of government, each branch must as a practical matter possess additional powers perforce implied from the right and obligation to perform its constitutional duties. Because each branch has those implied powers, which are also referred to as "incidental" or "inherent" powers, Article 8 may constitutionally encompass a sensible degree of elasticity. Accordingly, instead of interpreting Article 8 in a "literal sense," the Court has read it to preserve to the one branch of government its essential functions and to prohibit any other branch from interfering with or usurping those functions.

*Id.* at 371-72 (citation modified).

The Department first argues that, to the extent the courts imposed sanctions to compel the Department to undertake systemic reform, the orders encroached on the duties of the Legislative and Executive Branches over budgeting, appropriations, and expenditures. This argument is a nonstarter. As discussed above, the record does not support the conclusion that Judge Murphy or Judge Purpura entered the sanctions orders to spur systemic reform.[22,23]

The Department next argues that the circuit courts violated Article 8 by imposing sanctions designed to compel the Department to prioritize Respondents over other individuals who are subject to court-ordered placements. According to the Department, the

---

[22] Most of the Dissent's separation-of-powers analysis proceeds from the same flawed premise. As discussed, the circuit courts did not impose sanctions to compel systemic reform or to punish the Department for not having reformed the system in years past.

[23] The Department also suggests that the sanctions orders violated Article 8 by "compel[ling] the expenditure of unappropriated funds and thus render[ing] the appropriations process a nullity." This contention lacks merit. As Respondents point out in response, the Department has not established that funds currently appropriated to it are unavailable to pay the ordered sanctions.

courts impermissibly encroached on the prerogatives of the Executive Branch to perform the Department's essential functions. Alternatively, they invoke the doctrine of constitutional avoidance to argue that CP § 3-106 should be interpreted not to authorize courts to compel the Department to change how it prioritizes patients.

Respondents argue in their supplemental brief that, in ordering sanctions, the circuit courts did not violate Maryland's separation of powers. Rather, Respondents assert, the courts exercised the lawful authority the General Assembly granted to them to compel the Department to timely transfer IST defendants. We agree.[24]

As Respondents correctly observe, "the General Assembly enacted the 10-day requirement as a prophylactic measure designed to protect the constitutional rights and dignity of people deemed incompetent to stand trial and dangerous." The General Assembly acted well within its legislative authority in enacting this measure. The Department does not contend to the contrary.

The General Assembly also had the power to create a mechanism to compel compliance with the provisions of CP § 3-106(c)(2). The General Assembly did not violate the separation of powers by providing courts with the discretion to impose sanctions where doing so is reasonably designed to compel the Department to comply with its obligations under the statute. In awarding sanctions to enforce compliance with CP § 3-106(c), a court engages in a quintessential judicial function that is specifically authorized by law. In this

---

[24] Because we conclude that the General Assembly did not violate Article 8 in authorizing circuit courts to impose sanctions under CP § 3-106(c)(4), the doctrine of constitutional avoidance has no application.

respect, as Respondents observe, their cases are distinguishable from cases in which courts ordered executive agencies to perform acts not permitted or required by law. *See Maryland Dep't of Health v. Prince George's Cnty. Dep't of Soc. Servs.*, 47 Md. App. 436 (1980) (holding that juvenile court violated separation of powers by ordering Department to pay cost of treatment for a child in need of assistance at private institution where the order was not authorized by statute); *In re Demetrius J.*, 321 Md. 468, 476 (1991) (holding that juvenile court could not order Department of Juvenile Services to transfer delinquent youth to specific facility because legislative language, legislative purpose, and policy goals associated with governing statutes "lead inevitably to the conclusion that the Legislature intended that the particular facility in which a delinquent child may be placed is within the exclusive discretion of DJS").

These cases are also distinguishable from those upon which the Dissent relies, such as *Sugarloaf Citizens Ass'n v. Gudis*, 319 Md. 558 (1990). *See* Dissenting Op. of Booth, J., at 40-46. Section 3-106(c)(4) does not require a court to act in a manner that is inconsistent with the standards or rules normally applied by courts in the exercise of their discretion or to exercise powers not within the ordinary or recognized powers of a court. Nor has the General Assembly provided courts with insufficient guidance for the court's exercise of discretion in imposing sanctions under § 3-106(c)(4). Although § 3-106(c)(4) is not a contempt provision, its goal of compelling compliance with a court order is essentially identical to the purpose of a constructive civil contempt proceeding. Unlike statutes that authorize courts to perform non-judicial tasks, such as approving accounts of county officers before payment, appointing a board of visitors to supervise the county jail,

and issuing liquor licenses, *see* Dissenting Op. of Booth, J., at 43, § 3-106(c)(4) authorizes

judges to perform a task that is immediately recognizable as judicial in nature. In addition,

the requirement that a sanctions order be reasonably designed to compel the Department's

compliance sufficiently constrains a court's exercise of discretion.[25]

To the extent the legislative policies furthered by § 3-106(c)(4) allegedly are in

conflict with other legislative mandates, including the Department's statutory authority to

"[s]upervise the custody, care, and treatment of individuals in State facilities who have

mental disorders," HG § 7.5-205(b), that is a potential conflict to be resolved by the

General Assembly. It is not evidence of a violation of the separation of powers. There is

no basis on which to conclude that the circuit courts interfered with or usurped essential

functions of the Department by imposing sanctions under § 3-106(c)(4).

## IV

## Conclusion

The Department faces significant challenges in placing IST defendants within 10

business days. Regardless, the General Assembly has authorized trial judges to impose

monetary sanctions that are reasonably designed to compel the Department to admit the

defendants before them to designated health care facilities as soon as possible. The General

Assembly provided Maryland courts with this authority to safeguard the constitutional

rights and dignity of individuals deemed incompetent to stand trial. Restoration of

---

[25] The Department did not challenge the amounts of the sanctions orders in these cases as unreasonable. That being the case, we are not called upon to consider what would constitute an unreasonably large sanction.

competency of an IST defendant as soon as possible affords the defendant an opportunity

to meaningfully participate in their criminal proceeding; it also benefits any victims of the

alleged crime, the prosecution, and the public. The circuit courts in these cases did not

abuse their discretion in imposing sanctions.

It is up to the General Assembly to make further amendments to CP § 3-106(c)(4)

if it agrees with the Department that changed circumstances since 2018 call for a different

approach.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Kent County
Case Nos. C-14-CR-21-000044, C-14-CR-23-000050, C-14-CR-23-000146

Circuit Court for Baltimore County
Case Nos. C-03-CR-24-000015, C-03-CR-24-000251, C-03-CR-23-002969,
C-03-CR-23-003449, C-03-CR-23-003775

Argued: January 6, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 35

September Term, 2025

MARYLAND DEPARTMENT OF HEALTH

v.

JEFFREY BOULDEN, et al.

Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,
Hotten, Michele D.
  (Senior Justice, Specially Assigned),

JJ.

Dissenting Opinion by Booth, J., which Gould
and Killough, JJ., join.

Filed: July 15, 2026

Respectfully, I dissent.

In this case, we must determine the meaning of certain legislative amendments enacted by the General Assembly in the 2018 Legislative Session to subsection (c) of Section 3-106 of the Criminal Procedure Article of the Maryland Code. Effective October 1, 2018, CP § 3-106(c) now provides, in pertinent part:

> (2) If the court commits a defendant to the Health Department under paragraph (1) of this subsection, the Health Department shall:
>
> > (i) admit the defendant to a designated health care facility as soon as possible, but not later than 10 business days after the Health Department receives the order of commitment; and
> >
> > (ii) notify the court of the date on which the defendant was admitted to the designated health care facility.
>
> * * *
>
> (4) If the Health Department fails to admit a defendant to a designated health care facility within the time period specified in paragraph (2)(i) of this subsection, the court may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the time period specified in paragraph (2)(i) of this subsection at the daily rate specified in § 9-402(b) of the Correctional Services Article.

As I will discuss more fully below, the statutory language in question requires the Health Department (the "Department") to admit a defendant who has been determined to be incompetent to stand trial to a designated health care facility within 10 days after the Department receives a commitment order. If the Department fails to comply, a "court may impose any sanction reasonably designed to compel compliance," including requiring that

the Department reimburse a detention facility for costs incurred in retaining the defendant "beyond" the 10-day period.

It is undisputed that for some time, the State of Maryland has been faced with a shortage of treatment beds in designated facilities for individuals who are found incompetent to stand trial and are then committed to one of these facilities. As it stands, with the waiting list of individuals who need beds, it is mathematically impossible for the Department to place these individuals in beds without constructing more facilities, unless, of course, the need for such beds decreases. That has not occurred. In fact, since 2017, the need for beds has exploded. We accepted the Department's petition for writ of certiorari to answer the following questions, which I have rephrased:

1. Are monetary sanctions "reasonably designed to compel compliance" with the Department's obligation to admit criminal defendants within 10 business days of their being committed as incompetent and dangerous, where the Department's failure to admit these defendants resulted from an extreme shortage of hospital beds that it is making extensive efforts to alleviate?

2. Are monetary sanctions "reasonably designed to compel compliance" where issued after the Department has already admitted the defendant, so that there is no compliance left for the circuit court to compel?

We also requested supplemental briefing on the following question:

3. In imposing the monetary sanctions against the Department of Health in these cases, did the circuit court violate Article 8 of the Maryland Declaration of Rights?

I would answer questions 1 and 2 "no." On question 3—the question for which we sought supplemental briefing—I would answer "yes."

2

I would hold that interpreting CP § 3-106(c)(4) to authorize judges to impose sanctions on the Department for failure to place individuals within the 10-day period, without a finding that the Department acted willfully or had the present ability to comply with a commitment order, violates Article 8 of the Maryland Constitution. Such an interpretation: (1) creates an inherently arbitrary sanctions scheme by granting judges unbounded and standardless discretion to decide, on a case by case basis, whether the Department has done enough or is doing enough to address a decade-old systemic shortage—a question of policy, not a judicial function; (2) invades the core function of the Executive and Legislative branches by creating a de facto appropriations mechanism; and (3) has the effect of invading the Department's management of the admissions process by ordering priority of one defendant over others, which is one of the Department's essential functions entrusted to it by the General Assembly.

Because such an interpretation is, in my view, unconstitutional, I would apply the canon of constitutional avoidance and interpret CP § 3-106(c)(4) in a reasonable manner consistent with existing judicial functions, and interpret the statute as follows.

*First*, the Department's failure to comply with CP § 3-106(c)(4) may result in a constructive civil contempt proceeding. In other words, if the Health Department fails to admit a defendant to a "designated health care facility" within the 10-day period, a court "may impose any sanction reasonably designed to compel compliance" upon the findings required for constructive civil contempt, *i.e.*, that the Department acted willfully or had the present ability to comply with the commitment order. Imposing a sanction through a constructive civil contempt proceeding based upon a willful failure

3

to comply with the court's commitment order falls squarely within a core judicial function.

*Second*, where the Department's failure to comply is not the result of willful or purposeful conduct, I would construe CP § 3-106(c)(4) to authorize the court to order that the Health Department "reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the time period specified in paragraph (2)(i) of this subsection at the daily rate specified in § 9-402(b) of the Correctional Services Article." Such an interpretation is also consistent with a core judicial function— computing a compensatory reimbursement amount where a party fails to comply with a court order.

I would reverse the judgment of the Appellate Court.

# I

## Background

Before I turn to the underlying cases, and my statutory analysis, it is instructive to set forth (1) an overview of the procedures governing competency evaluations and commitment orders in Maryland; (2) the "sanctions" legislation that the General Assembly enacted in 2018 to address the statewide crisis in lack of adequate care for individuals who were found by a court to be incompetent to stand trial and dangerous; and (3) the Appellate Court's construction of the legislation in *Maryland Department of Health v. Myers*, 260 Md. App. 565 (2024), which has been applied by the circuit courts in awarding sanctions against the Department under CP § 3-106(c)(4).

4

## A.

## Competency and Commitment Procedures

The State may not proceed with a criminal prosecution "against a defendant who is not competent to stand trial." *Powell v. Maryland Department of Health*, 455 Md. 520, 527 (2017). A defendant found incompetent to stand trial may not be detained "unless the government is taking steps to provide treatment to restore the defendant to competence or to have the defendant civilly committed." *Id.* A trial court determines "whether a defendant is competent, is dangerous to self or others, and, if incompetent, has the potential to be restored to competence." *Id.*

A person is "[i]ncompetent to stand trial" if he or she is unable "(1) to understand the nature or object of the proceeding; or (2) assist in one's defense." Md. Code Ann., Crim. Proc. ("CP") § 3-101(f) (2025 Repl. Vol.). When a defendant "appears . . . to be incompetent[,]" the court "shall determine, on evidence presented on the record," whether the defendant is "incompetent to stand trial" ("IST"). *Id.* § 3-104(a). To aid in this determination, a court may "order the [Department] to examine the defendant." *Id.* § 3-105(a)(1). The Department must provide the court with its opinion as to the defendant's competence to stand trial, and if that opinion is that the defendant is incompetent to stand trial, the Department must also provide an opinion on "whether, because of a mental disorder or an intellectual disability, the defendant would be a danger to self or the person or property of another, if released." *Id.* § 3-105(d)(3). If the court finds that the defendant is both incompetent and dangerous, it must order the defendant committed to a Department-designated facility until the court determines that "the defendant no longer is incompetent

5

to stand trial"; "the defendant no longer is, because of a mental disorder or an intellectual disability, a danger to self or the person or property of others"; or "there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future." *Id.* § 3-106(c)(1)(i)(1)–(3).

The criteria for releasing committed individuals are prescribed by statute. A committed person is eligible for discharge "only if that person would not be a danger, as a result of a mental disorder or an intellectual disability, to self or to the person or property of others if discharged." *Id.* § 3-114(b). And a committed person is eligible for conditional release "only if that person would not be a danger, as a result of a mental disorder or an intellectual disability, to self or to the person or property of others if released from confinement with conditions imposed by the court." *Id.* § 3-114(c).

Section 3-106(c) of the Criminal Procedure Article sets forth the process for committing a defendant to one of the Department's designated health care facilities.[1] It provides, in relevant part, as follows:

> If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of a mental disorder or an intellectual disability, is a danger to self or the person or property of another, the court shall order the defendant committed to the facility that the Health Department designates until the court finds that:
>
> 1. the defendant no longer is incompetent to stand trial;

---

[1] A "designated health care facility" means "(i) a State facility as defined in § 10-101 of the Health – General Article; (ii) a State forensic residential center; or (iii) a hospital or private residential facility under contract with the Health Department to house and treat individuals found to be incompetent to stand trial or not criminally responsible." Md. Code Ann., Crim. Proc. ("CP") § 3-106(a)(1) (2025 Repl. Vol.). It "does not include a correctional or detention facility or a unit within a correctional or detention facility." *Id.* § 3-106(a)(2).

6

2. the defendant no longer is, because of a mental disorder or an intellectual disability, a danger to self or the person or property of others; or

3. there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

CP § 3-106(c)(1)(i).

Under the statutory scheme, defendants who have been committed by court order cannot be released without the court's permission. And as reflected above, the court— not the Department—determines whether a criminal defendant who has been committed as incompetent and dangerous should remain committed. *Id.* § 3-106(c)(1)(i), (d). Similarly, under Criminal Procedure § 3-118, the court determines whether a defendant found not criminally responsible may be discharged or released with conditions. *Id.* § 3-118(a).

In *Powell*, the appellants alleged that the Department violated an earlier version of CP § 3-106 when it failed to comply with the timeline specified in a trial court's order of commitment. 455 Md. at 541. The trial court's order required the Department to place the appellants (who had been found IST and a danger to self or others) in a facility within one day of the issuance of the order; however, the appellants were admitted between 12 and 36 days later. *Id.* We held that, although the Department may have violated the commitment order because of the delay, it did not violate the statute because the statute in effect at the time "d[id] not set a deadline for admission to a psychiatric hospital[,]" nor did "it authorize a [] court to do so." *Id.* at 528.

7

**B.**

**The General Assembly's 2018 Amendments to CP § 3-106**

The General Assembly responded to *Powell* by amending CP § 3-106 to add a 10-day deadline for admission. 2018 Md. Laws, Chs. 188, 189. Those amendments provide that, after receiving a commitment order, the Department must admit the defendant "as soon as possible, but not later than 10 business days after [it] receives the order of commitment."[2] CP § 3-106(c)(2)(i). As noted above, under the 2018 amendments to CP § 3-106(c)(4), "the court may impose any sanction reasonably designed to compel [the Department's] compliance" with the 10-day deadline; the sanction may include requiring the Department "to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the time period specified in" CP § 3-106(c)(2)(i) "at the daily rate specified in § 9-402(b) of the Correctional Services Article." *Id.* § 3-106(c)(4).

The legislative record for the 2018 amendments documents that, before 2017, while forensic demand remained constant, the Department reduced hospital staffing and capacity, and a decentralized admission system and inefficiencies within the Department contributed to routine delays in admitting defendants who were subject to a commitment order. The

---

[2] The Department is also mandated to admit other patients to its facilities for institutional inpatient care or treatment. If a defendant is determined to be guilty but not criminally responsible, the court must commit the defendant to the Department, CP § 3-112, and the Department must "(1) admit the defendant to a designated health care facility as soon as possible, but not later than 10 business days after the Health Department receives the order of commitment; and (2) notify the court of the date on which the defendant was admitted to the designated health care facility[,]" *Id.* § 3-112(e).

8

legislative history reflects that the delay in treatment was a crisis that needed to be addressed.

### 1. Preamble

The Preamble to H.B. 111 and S.B. 233 state as follows:

> WHEREAS, The unreasonable detention of defendants found incompetent to stand trial or not criminally responsible outside a treatment facility is a serious public safety risk and a violation of the U.S. Constitution; and
>
> WHEREAS, Keeping potentially dangerous, seriously mentally ill defendants from treatment exacerbates their problems and violates their right to due process; and
>
> WHEREAS, These individuals should promptly undergo competency restoration in a hospital designated by the Maryland Department of Health and not in a correctional facility; and
>
> WHEREAS, The crisis of delayed treatment for seriously mentally ill and incompetent defendants in Maryland has been foreseeable for many years and well-documented, facilitated by a steady reduction in capacity and staff of State hospitals while the demand for forensic beds has remained constant; and
>
> WHEREAS, On August 28, 2017, the Maryland Court of Appeals, in Fredia Powell, et al. v. Maryland Department of Health, et al., No. 77, September Term 2016, held that, contrary to the intent of the General Assembly, the Annotated Code of Maryland does not authorize a court to set a deadline for admission of a defendant into a hospital; and
>
> WHEREAS, Seriously mentally ill and incompetent defendants will continue to be unlawfully housed in detention centers unless the courts have authority to impose deadlines to enforce court orders; . . .

H.B. 111; S.B. 233, 2018 Leg., 438th Sess. (Md. 2018).

### 2. Floor Report, S.B. 233

The Floor Report for Senate Bill 233 notes that "[t]he State's system for delivering forensic services has been subject to increased scrutiny and growing concern in recent

years." Floor Report, S.B. 233. The Floor Report discusses at length, not only the concern, but the challenges that had been facing the State for years and recounts the following.

<u>Forensic Services Workgroup</u>

In 2016, former Secretary of Health Van T. Michell convened the Forensic Services Workgroup to develop and recommend systemwide changes to the delivery of forensic services in the State. Floor Report, S.B. 233. The workgroup consisted of representatives from several State agencies, community providers, consumers, and advocates. In its final report, the workgroup noted several long-standing issues, including (1) the lack of available beds in State facilities to complete court-ordered forensic evaluations and court-ordered commitments within statutory time requirements; (2) the length of time it takes for individuals who have been assessed as ready for release to return to court for disposition; (3) the appropriate placement of incarcerated individuals ordered for evaluation and who are assessed, but not yet adjudicated, as IST; and (4) the impact on State facility staff from consistent overcapacity and care of a primarily forensic (rather than civil) population. The report also stated that one of the most "visible" issues *was the inability for the Department to respond to commitment orders within statutory timeframes due to a lack of available inpatient beds*. The report noted that the lack of beds was due not only to the actual number of available beds, but to a complicated and inefficient system.

The workgroup made six primary recommendations: (1) increase bed capacity within the Department; (2) increase availability of community crisis services; (3) expand the capacity of the Office of Forensic Services; (4) increase outpatient provider capacity to

10

meet the needs of forensic patients; (5) centralize the Department's forensic processes; and (6) increase education to reduce stigma in both the general public and the mental health treatment community.

The Department's 2017 Update

In a November 2017 presentation entitled "Update on Forensic Services: Mental Competency and Substance User Disorders," the Department outlined its actions in response to the workgroup's report. Among other actions, the Department reported that it: (1) planned to open 95 beds from April 2017 to April 2018; (2) expanded the Office of Forensic Services with additional staff and hired consultants to help with procedures and system changes; and (3) created a Central Admissions Office ("CAO") to serve as a single point of contact for submitting and inquiring about court orders and to handle all forensic evaluations and placements. The Floor Report noted that the CAO launched on October 13, 2017. The Department reported that, as of November 3, 2017, the backlog of court commitment orders was 13 (down from approximately 40 or 50 in June and July 2017). The Department stated that, for mental competency-related proceedings, its objective was to place defendants and inmates into facilities within a reasonable time from the date of the court order.

The Floor Report notes that the Department advised that the average wait time (from the date that a court order is issued to the defendant being admitted to a facility) was approximately 12 days in November 2017, and approximately seven days for the first half of December 2017. As of January 18, 2018, the waitlist was 19. In the Fiscal Impact and Policy Note discussed below, the Department had provided updated numbers. In February

11

2018, the average wait time was seven days, with five admissions occurring beyond 10 days. The average wait time in March 2018 was four days, with no admissions occurring beyond 10 days (as of March 16, 2018). S.B. 233, Fiscal and Policy Note (Third Reader–Revised) at p. 5.

### 3. Fiscal Impact and Policy Note, S.B. 233, Third Reader–Revised

The Fiscal Impact and Policy Note stated the following:

> The bill requires a court, upon a finding that a defendant is incompetent to stand trial (IST) and is a danger to self or others, or upon a verdict that a defendant is not criminally responsible (NCR), to enter an order of commitment that requires the Maryland Department of Health (MDH) to commit the defendant to a "designated health care facility" as soon as possible but no later than 10 business days after MDH receives the order. If MDH fails to timely place the defendant in a facility, the court may impose any sanction reasonably designed to compel compliance, including requiring MDH to reimburse a detention facility for costs incurred as a result of delayed placement.
>
> The Fiscal Summary also reflected the following effects:
>
> State Effect: *General fund expenditures increase minimally due to the bill's reimbursement provisions. Potential significant capital and general fund expenditures beyond FY 2023, as discussed below.* Revenues to the Department of Public Safety and Correctional Services (DPSCS) increase minimally from reimbursements.
>
> Local Effect: Local government revenues increase minimally due to the bill's penalty and reimbursement provisions. Expenditures are not materially affected.

(Emphasis added).

The Fiscal Impact and Policy Note expounded in some detail on the significant capital fund expenditures under State Fiscal Effect as follows.

12

The Department estimated that the bill resulted in the need for 50 to 150 additional beds in State facilities (in addition to the beds already planned for April 2017 through April 2018.)  Fiscal & Pol'y N., S.B. 233 at p. 5.  Thus, the Department advised that "a new State psychiatric facility *must be constructed to meet the bill's requirements*."  *Id.* (emphasis added).  The Department estimated that the new facility would have a 100-bed capacity and the total cost to be $92.5 million.  *Id.*  The Department additionally advised that, as this was an unplanned capital project, the facility would likely not be constructed for seven to nine years.   The Department estimated that a portion of capital expenditures—$2 million for planning purposes—might begin as early as fiscal 2023.  *Id.* at p. 6.  Based upon this information, the Department of Legislative Services assumed that if a new psychiatric facility was needed, construction would not begin until beyond fiscal 2023, and thus, "*any potential capital or operating expenditures for a new facility*" were not factored into the analysis.  *Id.* (emphasis added).

Given that existing facilities were unable to accommodate any additional admissions, the analysis assumed that the Department could be subject to "sanctions for failing to timely place defendants in appropriate facilities within a 10-day timeframe."  *Id.* at p. 6.  The analysis noted that the extent to which the Department would be subject to sanctions would depend on several factors: "(1) the backlog of admission at any given time, which varie[d]; (2) the number and frequency of commitment orders issued; (3) the length of each delay; and (4) judicial discretion in imposing sanctions."  *Id.*  The Department of Legislative Services "advise[d], that, given these factors, *any impact from the bill's penalty provisions is likely to be minimal*."  *Id.* (emphasis added).

13

Finally, the analysis noted that the Department may also be required to reimburse local detention facilities for costs incurred, to the extent that IST or NCR defendants are detained in those facilities due to the unavailability of treatment beds. Thus, the analysis explained, the Department's general fund expenses would "increase minimally" to reimburse local detention facilities.

### 4. *Some Amendments Between Introduction and Passage*

It is worth noting some key amendments to S.B. 233 and H.B. 111 as they moved through the legislative process. As introduced, the bills (1) created a "rebuttable presumption of contempt" if the individual was not placed in a designated facility on or before the date specified in the commitment order; (2) stated that "a lack of available beds is not a sufficient reason for not placing a defendant as ordered in a commitment order" and (3) permitted contempt fines against the Department, or any Department official, in an amount "not to exceed $160 per day for each violation[.]"

As enacted, the statute does not contain language that would have established a rebuttable presumption of contempt where a defendant was not admitted within the 10-day period and would have permitted contempt fines against the Department and "any official of the Maryland Department of Health not to exceed $160 per day for each violation." The statute also does not include the statement that "a lack of available beds is not a sufficient reason for not placing a defendant as ordered in a commitment order."

14

## C.

### *Maryland Department of Health v. Myers*

In *Maryland Department of Health v. Myers*, 260 Md. App. 565 (2024), the Appellate Court considered the 2018 amendments in the context of a consolidated appeal in which the Department challenged 14 separate orders that were issued due to its failure to admit defendants to a Department facility who were found IST and dangerous. Two of the cases arose in the Circuit Court for Anne Arundel County, and 12 of the cases arose in the Circuit Court for Baltimore City. The Anne Arundel County cases were actions in which the circuit court held the Department in constructive civil contempt for failure to admit the defendants in those cases to a designated facility within the 10-day statutory period. *Myers*, 260 Md. App. at 609–10. In the Baltimore City cases, the defendants brought sanctions actions under the 2018 legislative amendments that now comprise CP § 3-106(c)(4). It was undisputed that, in every case, the Department had failed to admit the defendants to a designated facility within the 10-day statutory period.

In the context of that case, the Appellate Court discussed the 2018 legislative amendments. The court observed that under the amendments, where the Department does not admit the defendant to a Department facility within the 10-day period, the statute now provides *two* ways to attempt to compel compliance. *Myers*, 260 Md. App. at 634. First, the court explained, a party can file an action for constructive civil contempt. *Id.* Second, under the 2018 amendments, the court observed that "a party can file an action for statutory sanctions under CP § 3-106(c)(4)." *Id.* The court described the differences between the two actions. "Constructive civil contempt requires a finding, based on evidence, of a

15

willful failure to comply with the court's commitment order." *Id.* (citing *State v. Crawford*, 239 Md. App. 84, 109–12 (2018)). The court correctly pointed out that a finding that an individual is in constructive civil contempt is valid only if it:

> (1) [I]mposes a sanction; (2) includes a purge provision that gives the contemnor the opportunity to avoid the sanction by taking a definite, specific action of which the contemnor is reasonably capable; and (3) is designed to coerce the contemnor's future compliance with a valid legal requirement rather than punish the contemnor for past, completed conduct.

*Id.* at 634 (quoting *Breona C. v. Rodney D.*, 253 Md. App. 67, 74–75 (2021)). The court then contrasted the General Assembly's 2018 "sanction" action, which requires no evidence of willful failure to comply with a court's commitment order:

> To find a violation of CP § 3-106(c)(2), the court needs to find only that the Department failed to admit an individual deemed IST and dangerous to a designated health facility within the statutorily required 10-day period. *A finding that the Department acted willfully or had the present ability to comply with the commitment order is not required.* If the court finds a failure to timely admit a defendant, the statute provides for the imposition of sanction "reasonably designed to compel compliance."

*Id.* (Emphasis added).

With respect to the Anne Arundel County cases in which the circuit court held the Department in constructive civil contempt, the Appellate Court reversed those judgments because there was no evidence in the record that the Department's conduct was deliberate or willful—rather, the evidence reflected that there were no beds available. *Id.* at 620, 626.

The Appellate Court also reversed the sanctions orders entered in the 12 cases in the Circuit Court for Baltimore City because the court imposed the sanctions without notice to the Department, and without conducting a hearing, which the court determined violated the Department's right to due process. *Id.* at 632.

16

# II

## The Circuit Court Proceedings

### A.

### Kent County Case

Jeffrey D. Boulden was charged in three separate criminal matters in the Circuit Court for Kent County. On February 2, 2024, the court issued three orders, finding Mr. Boulden IST and dangerous and ordering the Department to admit Mr. Boulden to a designated health care facility within 10 business days after receipt of the commitment orders. Mr. Boulden was not admitted to a designated facility until April 11, 2024.

### 1. *Show Cause Proceeding*

On February 24, 2024, Mr. Boulden filed a Request to Show Cause for Contempt of Court, asking the Circuit Court for Kent County to order the Department, through its Secretary, Laura Herrera Scott, M.D., M.P.H., to show cause why it had not complied with, and had "specifically ignored," the court's February 2, 2024, order requiring it to admit Mr. Boulden within 10 business days after receipt of the commitment order. The petition stated that, as of February 26, 2024, Mr. Boulden had not been placed in a Department health care facility and remained jailed at the Kent County Detention Center, which did "not have the necessary facilities to care for or rehabilitate" him.

After issuing a show cause order, the court held a show cause hearing on April 5, 2024. Bryan Mroz, Deputy Secretary of Operations in the Department Health Care System, testified that he oversaw eleven facilities, including adult hospitals and the Office of Court Ordered Evaluations and Placements, which included the CAO. The five adult psychiatric

17

hospitals were "joint commissioned accredited" and four of the five had "CMS accreditation."[3] These accreditations define the Department's standards of care, from "the facility itself, to patient care, to food, to engineering; everything in the facility." Without the accreditation, the Department would be unable to operate the facilities, and a failure to meet the standards of care could cause it to lose its license.

Mr. Mroz testified that there were 1,056 adult psychiatric beds across the five Department hospitals, and the average length of a patient's stay was "a little over two years." Mr. Boulden was not admitted to a designated facility within the mandated 10-day period because there was a waitlist for admission to a facility. Priority for placement off the waitlist depended on a variety of factors, including when the commitment order was received, patient acuity, the existence of a hospital warrant, the type of charges, and length of time on the list. There had been times when the Department had been in compliance with the statutory deadline. At the time of hearing, however, there were 202 individuals on the waiting list for admission to a Department facility, and approximately five hospital warrants had issued the previous night. The cost per day for treatment at a Department facility was approximately $600 to $1,000.

With respect to patient acuity, Mr. Mroz explained that clinicians at the detention centers examine patients to assess their condition and their risk to themselves or others. Suicidal or homicidal ideation, non-compliance with medication, and poor somatic

---

[3] CMS stands for the "Centers for Medicare and Medicaid Services."

18

condition are acuity factors that would move a patient higher on the waitlist. Mr. Boulden's tentative admission date was April 8, 2024.

When asked why there was a waitlist for beds, Mr. Mroz stated that was "a complicated question," but the "short answer" was that the Department did not have "enough beds for the number of court orders coming in." He stated that there had been a "dramatic increase" in commitment orders "over the past several years," resulting in inadequate capacity at Department facilities.

On cross-examination, counsel for Mr. Boulden introduced a chart submitted by the Department to the General Assembly, which showed the number of court ordered placements per year. Mr. Mroz testified that, in 2019, there were approximately 750 individuals admitted to a Department facility under court order. The number dropped to 600 in 2020 during the COVID-19 pandemic. By 2022, however, there were 860 placements by court order, and in 2023, there were 1,100 court-ordered commitments.[4] The chart showed that the number of patients actually admitted within the required 10-day period decreased "consistently from 2019 through 2023." Mr. Mroz stated that there was a period in 2020 and in early 2021 when the Department did meet the 10-day statutory deadline.

Although staffing had been an issue in the past, the Department at that time had sufficient adult psychiatric staffing "across the board for the beds that [it had]." Inadequate

---

[4] The data in the chart showed only 800 court-ordered placements in 2023, but Mr. Mroz testified that there were 1,126. He testified that the chart may only show placements for part of 2023.

staffing in step-down facilities operated by community providers, however, continued to affect the Department's ability to discharge patients from its five hospitals. The Department was "working with [community providers] every day on how to build up the[ir] capacity, to build up their funding, [and] to build up their plans so that they can expand to full capacity." Mr. Mroz explained that "back end" issues related to discharge, in addition to the "front end" issues related to the significant increase in commitment orders, both contributed to the Department's waitlist. On the hearing date, there were approximately 100 patients "clinically ready to be discharged," who had "operational obstacles" to discharge, such as the unavailability of community beds and lack of documentation.

Mr. Mroz testified about the Department's efforts to address the waitlist. In 2017, the Department created a centralized admissions process, which allowed it to "utilize every empty bed in the system" instead of patients being assigned to only one particular hospital. This change reportedly helped, and the Department was able to meet the 10-day time limit prior to the COVID-19 pandemic. Since then, the Department has been increasing community step-down beds, and building up assisted living and Residential Rehabilitation Program ("RRP") capacity. Mr. Mroz further testified that the Department recently added "at least 40 [beds] into the community." Many RRP beds were unavailable "due to staffing or during COVID," so the Department coordinated with these RRP providers to provide financial resources to open up more beds. It also coordinated with the Behavioral Health

Administration ("BHA") to provide funding for adequate staffing for specialized beds that require a high level of care.[5]

The Department had also been undertaking initiatives to address "front end" issues, such as better supporting communities to decrease the number of commitment orders. The Department additionally worked to find housing for discharged patients to enable them to have "an actual place to stay" and receive their medications.

With respect to undocumented patients, the Department had hired attorneys to assist patients in obtaining required documentation for placement in community facilities, and it "created a linkage through the [Maryland Department of Transportation]" to assist patients in getting necessary licenses. Mr. Mroz explained that patients cannot access funding for placements in community facilities without proper documentation, such as a driver's license or birth certificate, because they are "private institutions." Approximately 10 percent of the defendants committed to Department facilities are undocumented or under documented. When an undocumented patient is admitted to one of its hospitals, the Department starts working on obtaining documentation "as soon as [it] can" to facilitate discharge. The Department's early intervention has "really facilitated and helped decrease" the number of patients on the waitlist. The Department also created a pilot program to move patients from the adult psychiatric unit to long-term care, which has

---

[5] Mr. Mroz explained that the Department could not swap patients ready for discharge with patients waiting for admission in a detention center because they are court ordered to remain in the hospital until there is a discharge plan, and "often judges will not sign [for release] until [the Department] ha[s] an effective discharge plan."

21

different licensure and admissions requirements, and to bring community providers into the hospital to facilitate discharge.

Mr. Mroz next testified about the Department's construction initiatives to increase capacity of its current facilities. The Department sought to ensure that construction would meet the future needs of the system as commitments continued to increase. The Department added beds at Spring Grove Hospital and Springfield Hospital Center by looking "at every unit there was that could meet licensure requirements without renovations and opened them up." It also had plans to expand maximum security beds at Perkins, but it needed to expand capacity at Springfield first. In addition, the Department was "developing a master services plan to address . . . needs in the next . . . 10 to 20 years as [it] move[s] forward." Mr. Mroz also stated that the Governor's office had made the issue a "very high priority," and the Department received $107 million to build capacity and to implement the resources and supports.

Mr. Mroz explained that the Department could not "just put extra beds in the hallway or . . . rent space in a hotel" to add more capacity because of its accreditation:

> [S]o we have accreditation that stops us from doing that. You know, each patient needs to have a room and needs to have a certain amount of light, needs to have access to bathrooms, needs to have access to medications within a certain, you know, space and needs to have access to the right staffing, the right licensure staff . . . . It would jeopardize our accreditation and licensures if we were to exceed those limits or capacities. It would put us in jeopardy, which could then create a much worse problem.

He stated that courts cannot order defendants to be committed to private hospitals. However, they can order commitment to the State, and the State can partner with private facilities, but the Department's effort to use private facilities for direct placement after a

22

commitment order was only "mildly successful." He testified that the Department put out requests for proposals to private hospitals, but they did not get any effective response. Accordingly, there was "no real ability to transfer or hold [Department] patients in private facilities." Mr. Mroz stated that he believed that private providers were nervous about accepting Department's patients because of their criminal charges.

Mr. Mroz testified that the imposition of sanctions or providing reimbursement to the detention centers would not induce the Department's compliance with commitment orders, stating:

> [W] are spending millions of dollars trying to resolve this waitlist. I cannot imagine any fine—there's nothing that would help us move faster. We're moving as fast as we can.

> \*     \*     \*

> We're working as hard as we can to comply and get them in as quickly as we can. In [Mr. Boulden's] case we're watching it every day to make—you know, every chance we can get to move through that waitlist we take.

> \*     \*     \*

> With a 202 [person] waitlist we are getting to the most acute and the most needed patients first in the best way we can.

Mr. Mroz stated that the Department was monitoring the waitlist daily to get Mr. Boulden placed and "working as hard as [it could] to comply and get [him] in as quickly" as possible.[6] Mr. Mroz stated that the Department had "no ability at th[at] point" to comply

---

[6] Mr. Mroz testified that Mr. Boulden was tentatively scheduled to be admitted to a facility on April 8, 2024. He was admitted on April 11, 2024.

23

with the court's commitment order, and it was not "a deliberate strategy of delay on the part of the Department."

The Department's attorney highlighted this testimony when countering arguments that a monetary sanction in this case, where the defendant's condition was less acute, could reasonably compel compliance with the statutory deadlines:

> And again, these are clinical decisions. You know, these aren't just we get a court order and this person gets in a bed. How sick is the person? We have to put—I mean, we are a medical institution, right? We run hospitals. We have certifications and things like that and licenses that we have got to abide by. We have to treat the most sick people as quickly as we can, and that is why the list moves up and down and why—you know, someone's acuity could change. If someone gets worse, they get bumped up the list. They are not as sick, and that doesn't mean they are not sick, that doesn't mean we won't comply with the Court's order, that doesn't mean we are not trying. It just means that they are going to be lower on the list than someone that is really sick.

In his closing argument, counsel for Mr. Boulden requested that the court find the Department in contempt and impose statutory sanctions under CP § 3-106(c)(4). He argued that the ongoing problem of the Department not complying with the statutory deadline was not getting better, and the conclusion that needed to be reached was that it was not "really trying."

### 2. Court's Ruling

The court issued its ruling at the conclusion of the merits hearing. Based on the Appellate Court's decision in *Maryland Department of Health v. Myers*, 260 Md. App. 565 (2024), it found that the Department did not willfully violate the court's order for purposes of contempt. With respect to the imposition of statutory sanctions under § 3-106(c)(4), the court stated that, pursuant to *Myers*, a court need only "find that the

24

Department failed to admit an individual deemed IST and dangerous into a designated facility within the statutory 10-day period," "sort of like a strict liability standard." The court then found that the record and testimony clearly established that the Department failed to admit Mr. Boulden within 10 days of the commitment order, and that sanctions were appropriate.

In issuing sanctions, the court stated as follows:

The testimony that has been offered today indicates that it costs approximately $600 to $1,000 a day to keep an individual in the hospital. So that is sort of like the daily rate that is incurred by the Department for individuals to be held. The Court, therefore, trying to comply . . . with the requirement imposed by that section, that the Court may impose any sanction that is reasonably designed to compel compliance, . . . is going to impose a sanction of $2,000 per day starting today. The purpose of that sanction being to double the cost to the Department through [its] failure to comply with the statute, thereby hopefully incentivizing them to comply with the statute.

The court ordered that the Department pay the sanction, "beginning April 5, 2024, directly to the Clerk of the Circuit Court for Kent County until [Mr. Boulden] is placed."

### B.

### Baltimore County Cases

The Baltimore County cases initially included a petition for constructive civil contempt filed by Steven Kauffman, as well as four motions for statutory sanctions filed separately by Glenn Hawkins, William Lomax, Kennard Goins, and Malik Jackson. The Circuit Court for Baltimore County consolidated the matters for a hearing on May 8, 2024.

25

Mr. Hawkins was charged with various crimes in Baltimore County. On January 26, he was found incompetent and dangerous, and the court committed him to the Department. On March 29, Mr. Hawkins sought statutory sanctions under Criminal Procedure § 3-106(c)(4).

Mr. Lomax was charged with various crimes in Baltimore County. On March 13, he was found incompetent and dangerous, and the court committed him to the Department. On March 29, Mr. Lomax sought statutory sanctions under Criminal Procedure § 3-106(c)(4).

Mr. Goins was charged with various crimes in Baltimore County. On November 3, 2023, he was found incompetent and dangerous, and the court committed him to the Department. On March 29, 2024, Mr. Goins sought statutory sanctions under Criminal Procedure § 3-106(c)(4).

Mr. Jackson was charged with various crimes in Baltimore County. On November 6, 2023, he was found incompetent and dangerous, and the court committed him to the Department for inpatient care and treatment. On March 29, 2024, Mr. Jackson sought statutory sanctions under Criminal Procedure § 3-106(c)(4).

Mr. Kauffman was charged with various crimes in Baltimore County. On December 11, 2023, he was found incompetent and dangerous, and the court committed him to the Department. On April 4, 2024, Mr. Kauffman filed a petition for constructive civil contempt. Although the court denied the contempt petition on May 10, it allowed Mr. Kauffman to move for statutory sanctions, which he did on May 24.

26

### 1. Consolidated Hearing

As in the Kent County case discussed above, Mr. Mroz testified. Given the similarities in Mr. Mroz's testimony[7] in Kent County and the Baltimore County cases, it's worth recounting his testimony in some detail.

As the Deputy Secretary of Operations in the Department Healthcare System, Mr. Mroz testified that his job responsibilities included the admission of defendants into Department hospitals. He explained that, in the Department Healthcare System, there is an Office of Court-Ordered Placement, and within that, a Centralized Admissions Unit. There were 11 facilities in the Department Healthcare System, five of which were adult psychiatric hospitals. He described the accreditations required for the facilities and stated that failure to meet required certification standards could result in the Department losing its license and CMS funding, as well as facility closure.

Mr. Mroz stated that there are 1,056 beds in the Department's adult psychiatric system, and the average hospitalization lasts "[a] little over" 850 days. He noted that Clifton T. Perkins is the State's only maximum-security forensics facility, and it has 189 beds. Mr. Mroz testified that the individuals were not admitted within 10 business days of their respective commitment orders because the Department did not have any available beds. He explained that every bed in the Department's system was "maxxed out," and any vacancy was momentary until the room could be cleaned, or clearance was obtained from

---

[7] In addition to Mr. Mroz, Tonya Smith-Barrow, the Mental Health Coordinator at the Baltimore County Detention Center testified, as well as Hilary Siakor-Sirleaf, the Deputy Director for the Baltimore County Department of Health.

the detention center. He further stated that a new patient could be admitted only after an existing patient was discharged, and that the length of a stay at Perkins was much longer than other Department facilities because the patients have "highly complex" cases.

Mr. Mroz observed that the number of defendants on the waitlist for a Department facility was at a record high, despite efforts to improve the admissions and community discharge process. In 2017, the Department improved the admissions process to address delays in complying with commitment orders. He testified that after "fix[ing]" the admissions process, however, there were issues with community placements, and the Department noticed "a rapid increase in the number of Court Orders and Court-Ordered evaluations." Hospital warrants had also increased, contributing to the bed shortage.

On the day of the hearing, Mr. Mroz testified that there were 202 people on the waitlist and 800 hospital warrants, which are prioritized for placement. Defendants who needed treatment at Perkins were not included on the general waitlist for the other Department facilities. Admission to one of the other four Department facilities was based on several factors, including the date of the commitment order, whether a defendant's charges will time out, the resources of the detention facility, and the defendant's acuity. Mr. Mroz explained that acuity, which is a "very specific measure of [a defendant's behavior]" based on a clinical decision, impacted movement off the waitlist more than the other factors. Defendants could move up on the waitlist if their acuity increased due to decompensation resulting in more severe, intense, and complex behaviors. Mr. Mroz stated that the Department tried to "make sure those that need the help the most get in as quickly as we can."

28

Acuity checks were performed on a weekly basis, and the Department was available around the clock to respond to emails and telephone calls regarding a defendant's acuity. According to Mr. Mroz, acuity ratings are based on various factors, including a defendant's homicidal ideations, actual harm to others, suicidal ideations, self-harm, medication compliance, and somatic health. Clinicians who worked at the Baltimore County Detention Center ("BCDC") were not Department employees, and Mr. Mroz was not aware of each clinician's specific qualifications.

Addressing the individual defendants, Mr. Mroz testified that Mr. Kauffman had undergone an acuity check the prior week and was not on the high acuity list. He did not have a tentative admission date. With respect to Mr. Jackson, the detention center and clinician advised that he could be maintained safely at the BCDC. He had a tentative admission date of May 9, 2024. Mr. Lomax did not have "acuity issues," and he did not have a tentative admission date.[8]

Mr. Mroz's testimony recounted the challenges the Department faced in clearing the waitlist for admission to a Department facility. He explained that the Department was focusing a lot on securing safe community placements. The Department maintained an active list of patients that were ready for discharge to a less restrictive environment, but there were operational obstacles that prevented discharge. Available discharge placements included residential rehabilitation, assisted living, and nursing homes, and patients had "some choice where they go." The Department had teams "assigned to each one of those

---

[8] Mr. Hawkins and Mr. Goins were admitted to a Department facility prior to the hearing.

areas . . . to get people moving as quickly and efficiently as possible, always maintaining safety that whole time."

Two assisted living units were located on the grounds of Department facilities: a 19-bed unit located at Springfield and a 22-bed unit located at the Finan Center. Mr. Mroz testified that these units opened within the past two years. Construction was underway at a building on the Springfield campus to expand assisted living capacity and free up hospital beds. Certain community placements were reluctant to take Department patients directly from the hospital, but they were more amenable to accepting them if the Department showed that they were successful in the assisted living unit. The Department also encouraged community providers to work with patients in Department facilities before discharge to facilitate a faster and smoother transition to community care.

Mr. Mroz described the Department's efforts to address the admissions waitlist. In 2017, the Department undertook an internal review and established an Office of Court-Ordered Placements and a Centralized Admissions Unit. This allowed it to "utilize all beds across the system" to improve the efficiency of admissions. In 2021, the Department created the Department Healthcare System to standardize the administration of State hospitals, which had previously operated independently of one another. Under the new structure, the Department shared best practices and gathered resources to help with placements.

After determining that it needed to expand capacity, the Department began efforts to build more assisted living units and ensure that all of its beds were occupied and the facilities were fully staffed. Mr. Mroz stated that "building in the state takes quite a long

time," but the Department started the building initiatives "many years ago to get through the process." During the COVID-19 pandemic, many of the community facilities could not remain open due to lack of funding and staffing issues, so the Department "reallocate[d] beds that were not being used" and conducted a state-wide analysis of the location of open beds so it could "take beds that aren't utilized in one area of the state and open up beds in another for RRPs." The Department established grant funding and expanded the number of beds in the assisted living sector, adding 25 beds in 2023. It also added 40 beds to the RRPs, whose licensing requirement are "a little bit more rigid."

The Department also initiated a program to address challenges involving discharge of undocumented or under-documented individuals to community facilities. Mr. Mroz testified that un-documented and under-documented people comprise ten percent of the Department's hospital system. The Department contracted with attorneys to obtain documentation for these individuals so that funding could be secured for a community placement before their discharge from a Department hospital. Securing services and funding prior to discharge significantly sped up the discharge process to make beds available, and it had a "big impact on th[e waitlist number]."

With respect to sanctions for failure to comply with commitment orders, Mr. Mroz testified that sanctions would not induce compliance because the Department was "spending millions and millions of dollars trying to solve this. Hundreds of millions if you count the money from the Moore-Miller . . . Administration." He stated that the Department was "trying to do everything we can to get in compliance . . . spending . . . thousands and thousands of man hours working on this." Mr. Mroz testified that a fine

would not overrule the Department's clinical decisions, and the real problem was bed space. He agreed that the bed problem had been an issue for at least 10 years. He stated that the Department's failure to admit defendants within 10 business days of the court order was not a willful violation or a deliberate strategy of delay because it did not have the ability or opportunity to comply.

On cross-examination, Mr. Mroz testified that the Department's bed capacity had not changed since the last time he had been in court, approximately seven months earlier. The Department still had 1,056 beds. At the time of his earlier testimony, there were 174 people on the waitlist, and at the time of the hearing, there were 202 people on the waitlist, an increase of 28 people. He stated, however, that capacity was only one issue. Facilitation of community placements to allow for discharge and prevention of commitment orders in the first place "would reduce the waitlist faster than building a bed." Mr. Mroz explained that there had been an increasing number of committed defendants over the past four or five years, rising from 500 to a record number of 1,100 in 2024.

As a result, he testified, diversion of defendants in low-level cases from the criminal justice system would help alleviate the dearth of beds. Mr. Mroz further stated that this issue had been discussed across the State. The Department had recently set up crisis intervention teams across the State, which was part of the $107 million from the Moore-Miller administration, and the Department was hiring staff and securing technology to build the program. The Department was working with some jurisdictions across the State, including Montgomery County and Anne Arundel County, on diversion techniques to prevent arrests.

32

Mr. Mroz testified that, by the end of 2026, the Department would have approximately 120 additional beds available for defendants committed to Department facilities. He acknowledged, however, that the current waitlist exceeded this number and continued to increase. He explained that capacity was only one issue, and front-end interventions to reduce the number of commitment orders would also impact the waitlist.

### 2. Court's Ruling on the Record

The court issued a ruling on the record after closing arguments, and began by noting that CP § 3-106(c)(4) "was revised in 2018 as a result of the very problems that we're attempting to address today." It stated that the General Assembly gave the court the tool of a sanction to enforce commitment orders because it was so difficult to prove the willful non-compliance necessary for a contempt finding. The court found that "the Department really has not made sufficient efforts . . . to address the problem," which started "many years prior to 2018."

Citing *Myers*, the court stated that CP § 3-106(c)(4) "permits sanctions based on a [mere] failure to comply with a 10-day deadline if the sanctions are reasonably designed to compel compliance." The court stated that it did not believe testimony that sanctions would not compel compliance, observing that "the mere fact that efforts weren't made in 2018 to start to address the problem in itself, cries out for a sanction," and stating that, as the number of commitment order violations increase, the monetary sanction for each case will coerce compliance "once the Department is made to understand that they will have to pay the monetary sanction."

The court ruled that, for each of the five defendants, the Department clearly violated the statute by failing to commit them to a Department facility within 10 business days of the commitment order. It found that the imposition of sanctions under the statute in each of the five cases would compel compliance. The court imposed a sanction of $1,000 for each day the defendants remained in detention past the 10-day statutory period. The sanctions for each defendant were, as follows:

- Mr. Lomax: $46,000 based on March 13, 2024 commitment order and an 8-week delay in admission.

- Mr. Hawkins: $67,000 based on a January 26, 2024 commitment order and his admission on April 3, 2024, a 67-day delay.

- Mr. Goins: $182,000 based on a November 3, 2023 commitment order and his admission on May 6, 2024, a 182-day delay.

- Mr. Jackson: $174,000 based on a November 6, 2023 commitment order and a 174-day delay in admission at the time of the hearing.

- Mr. Kauffman: $139,000 based on a December 11, 2023 commitment order and a 139-day delay in admission at the time of the hearing.

### 3. The Court's Motion for Reconsideration—Mr. Kauffman

On or about May 10, 2024, the court, sua sponte, reconsidered its ruling in the case involving Steven Kauffman because that matter was brought as a contempt action, not as a motion for sanctions, and therefore, the statutory sanction did "not automatically apply." The court denied Mr. Kauffman's petition for contempt and struck the sanction imposed without prejudice, noting that counsel was free to file a motion for sanctions incorporating the testimony and arguments from the May 8, 2024 hearing, unless the Department objected.

34

On May 24, 2024, Mr. Kauffman filed a motion for sanctions pursuant to CP § 3-106(c)(4), requesting that the court incorporate the testimony, arguments, exhibits, and evidence presented at the May 8, 2024, hearing. He requested that the court issue an order imposing sanctions against the Department in the amount of $139,000 and directing the Department to transfer him to an appropriate Department facility.

On July 9, 2024, the court held a hearing to determine whether the Department had taken any action since the May 8, 2024, hearing to admit Mr. Kauffman. Amelia Tibbett, the Acting Director for the Department's Office of Court Ordered Evaluations and Placements, testified that she supervised the entire admissions process for defendants deemed IST and dangerous. She stated that the Department had exceeded the admissions deadline in Mr. Kauffman's commitment order by 139 days, and since the May 8, 2024 hearing on the contempt petition, the Department had not taken any additional steps to admit Mr. Kauffman other than consistently managing the waitlist, monitoring acuity, and assessing current patients to determine whether discharge was appropriate.

At that time, the Department was in the procurement process for additional beds at its Perkins and Springfield facilities. At Springfield, the Department was refitting an outdated area to add 40 beds that would comply with hospital standards; and at Perkins, it planned to convert minimum security beds to maximum security beds, which would increase maximum security capacity by 20 beds. While groundbreaking for these projects was expected in 2025, the Department was "still working on different aspects of gearing up for this project[]" and was also looking for additional sites.

35

Mr. Kauffman's charges mandated that he be admitted to Perkins, and he was number three on the waitlist for that facility.[9] The Department had plans to add capacity at Perkins, but Ms. Tibbett did not know of any plans to build another maximum security facility. Ms. Tibbett testified that the only factor that would "speed up his placement would be . . . decompensation of his acuity," and any defendant subject to a hospital warrant would have admission priority over Mr. Kauffman. The detention centers designated a clinical professional to receive and conduct acuity assessments every two weeks from the Department's CAO, and clinical teams within the CAO reviewed acuity assessments from the detention centers. If a defendant was listed as acute, the Department requested relevant medical records and initiated the process for hospital admission. Mr. Kauffman was not listed in an acute status during his acuity check on June 27, 2024.

At the close of evidence and after brief closing statements, the court issued a sanction against the Department of $1,000 for each day the Department exceeded the 10-day admission requirement of the commitment order, for a total of $191,000, stating that "the length of time that [Mr. Kauffman] has been languishing in prison, as opposed to in a hospital, is, quite frankly, outrageous and a clear violation of the statute." The court acknowledged that the government procurement process was lengthy, but it stated that "if there really was a concerted effort being made, it would seem to me that that may have

---

[9] Ms. Tibbett testified that, after Mr. Kauffman's May contempt hearing, Perkins had experienced a measles and scabies outbreak, which halted new admissions for approximately one week.

happened a long time ago." Although acknowledging that the Department had an ethical obligation to admit the most seriously ill patients, the court stated that obligation did not change the requirements of the statute. The court did not find any evidence of an inability to comply with the statute's 10-day admission requirement, noting that the bed capacity issues were "long-standing and ha[d] not been adequately addressed." The court held, that regardless of the Department's ability to comply, the statute permitted a sanction designed to encourage compliance, and that the $191,000 sanction was sufficient to do that.

The court issued a written order on July 9, 2024, imposing a sanction of $195,000 against the Department. It ordered the Department to deposit those funds into the Registry of the Court.

**III**

**Construction of CP § 3-106(c)(4)**

In this case, we must determine the meaning of the phrase "reasonably designed to compel compliance" in CP § 3-106(c)(4). Specifically, where the Department fails to place the individual within the 10-day period—without a finding that the Department acted willfully or had the present ability to comply with the commitment order—does the phrase "reasonably designed to compel compliance" mean that a circuit court judge may consider whether the judge believes that the Department can do, or should have done, more to

37

combat system-wide failures,[10] and impose a sanction in any amount that the judge subjectively believes will "compel compliance"?

## A.

### Principles of Statutory Interpretation

This case requires us to interpret CP § 3-106(c)(4). The goal of statutory interpretation is to carry out the intent of the Legislature. *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024). That analysis begins with the "normal, plain meaning of the language of the statute." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021) (citing *Lockshin v. Semsker*, 412 Md. 257, 275 (2010)). We consider the plain language "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Wheeling*, 473 Md. at 377 (quoting *Lockshin*, 421 Md. at 276). Additionally, we construe a statute "as a whole, so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 179 (2022) (quoting *Wheeling*, 473 Md. at 376). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Wheeling*, 472 Md. at 377 (quoting *Lockshin*, 421 Md. at 276). If the text is ambiguous— or if we seek to confirm or check our plain language interpretation—we look to other

---

[10] The Majority claims that my separation of powers analysis rests on a "flawed premise" because the circuit courts "did not impose sanctions to compel systemic reform or to punish the Department for not having reformed the system in years past." Maj. Slip Op. at 48 n.22. The Majority can reach this conclusion only by disregarding the courts' own explanations, detailed herein, for sanctioning the Department.

indicia of legislative intent, including legislative history. *Westminster Mgt., LLC*, 486 Md. at 645; *see also Elsberry*, 482 Md. at 190. Text is ambiguous if "the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme[.]" *Bennett v. Harford County*, 485 Md. 461, 485–86 (2023) (quoting *Wheeling*, 473 Md. at 377).

There is another canon of statutory interpretation that is applicable here—the doctrine of constitutional avoidance. Under the "doctrine of constitutional avoidance . . . a statute will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible[.]" *Williams v. State*, 492 Md. 295, 321 (2025) (quoting *Koshko v. Haining*, 398 Md. 404, 425–26 (2007)); *see also Elsberry*, 482 Md. at 194 (same). We have "consistently adhered to the principle that 'an interpretation which raises doubt as to the legislative enactment's constitutionality should be avoided if the language of the act permits.'" *Edward Syss. Tech. v. Corbin*, 379 Md. 278, 293–94 (2004) (quoting *Harryman v. State*, 359 Md. 492, 509 (2000)).

Starting with the text, the statute says, "[i]f the Health Department fails to admit a defendant to a designated health care facility within" the 10-day period, "the court may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond" the 10-day period at the daily rate specified in § 9-402(b) of the Correctional Services Article. CP § 3-106(c)(4).

The Department argues that the plain text of the statute cannot be construed to permit circuit court judges to impose sanctions for the Department's failure to place a defendant in a designated facility within the 10-day period in the face of undisputed evidence that (1) the Department has more than 200 defendants waiting for placement due to a statewide bed shortage; (2) the Department must employ clinical standards in moving defendants off the waiting list and into a psychiatric facility; and (3) certain individuals on the list had clinical priority over the individual defendants whose placement the circuit court was attempting to compel. For the following reasons, I agree.

**B.**

**The General Assembly Can Delegate Only Judicial Functions to the Judiciary**

The Constitution of Maryland, unlike the United States Constitution, contains an express guarantee of the separation of powers among the respective branches of government. Article 8 of the Declaration of Rights provides:

> That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

More than 170 years ago, this Court explained that "the evident purpose of the declaration [of separation of powers] is to parcel out and separate the powers of government[.]" *Sugarloaf Citizens Ass'n v. Gudis*, 319 Md. 558, 569 (1990) (quoting *Wright v. Wright's Lessee*, 2 Md. 429, 452–53 (1852)). "Doing so preserves to each branch of government its essential functions, protected from encroachment by either of the others, so that each may serve as a check and balance on the power of the others." *In re Emergency*

40

*Remedy by Maryland State Board of Elections*, 483 Md. 371, 392 (2023) ("*In re Emergency Remedy*") (citing *McCulloch v. Glendening*, 347 Md. 283–84 (1997)). "The separation of powers thus serves as a fundamental building block of our constitutional structure that is critical to protecting against too great an aggregation of power in any one branch." *Id.*

"Although fundamental, the doctrine of separation of powers is not rigid and does not adhere to 'clear lines of demarcation.'" *Id.* at 393 (quoting *McCulloch*, 347 Md. at 283). In other words, the three branches are not "wholly separate and unmixed." *Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 370 (2022) (citation modified); *see also McCulloch*, 347 Md. at 284 ("[T]he separation of powers doctrine does not require absolute separation of powers between the branches of government."). "Recognizing that the functions of each branch of government must necessarily overlap to some degree, we have stated that the doctrine should be applied with a 'sensible degree of elasticity,' and not 'with doctrinaire rigor.'" *In re Emergency Remedy*, 483 Md. at 393 (quoting *Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 220 (1975)); *see also Murphy*, 478 Md. at 371. "Thus, no branch of government may intrude on the core functions of either of the others." *Id.* (citing *Att'y Gen. v. Waldron*, 289 Md. 683, 688 (1981)).

One way in which we have consistently preserved the separation of the Judiciary from the core functions of the other branches is by "repeatedly [holding] that 'Article 8 prohibits the courts from performing nonjudicial functions.'" *Sugarloaf*, 319 Md. at 569 (quoting *Reyes v. Prince George's County*, 281 Md. 279, 295 (1977)); *see also, e.g., Duffy v. Conaway*, 295 Md. 242, 254 (1983) ("[A] court has no jurisdiction to perform a nonjudicial function, and any enactment which attempts to confer such a function on a

41

court is unconstitutional."); *Cromwell v. Jackson*, 188 Md. 8, 28 (1947) ("[W]hen this Court is of [the] opinion that the Legislature has exceeded its authority in placing a non-judicial function on the Court, we should not hesitate in declaring the Act void."); *Prince George's County Comm'rs v. Mitchell*, 97 Md. 330, 340 (1903) (holding unconstitutional a statute that indirectly required "[j]udges to discharge non-judicial functions"); *Bd. of Supervisors of Election for Wicomico County v. Todd*, 97 Md. 247, 263–64 (1903) (stating that "[c]ourts and [j]udges provided for in our system shall not only not be required, but shall not be permitted, to exercise any power or to perform any trust or to assume any duty not pertaining to or connected with the administering of the judicial function"); *Beasly v. Ridout*, 94 Md. 641, 659 (1902) (stating that "[j]udges cannot be compelled to perform services not of a judicial nature"); *Baltimore City v. Bonaparte*, 93 Md. 156, 162 (1901) (holding that the "Legislature had no authority to impose" a nonjudicial function on judges). Thus, even where the Legislature attempts to confer authority upon the Judiciary, as it has done in CP § 3-106(c)(4), the delegation complies with Article 8 only if the task to be performed constitutes a judicial function.

*In re Emergency Remedy* is this Court's most recent and fulsome discussion of what constitutes a "judicial function" for purposes of a separation of powers analysis. 483 Md. at 395–98. "In considering whether a particular task is a judicial function," we focus "on the act, not the person performing it." *Id.* at 395 (citing *Schisler v. State*, 394 Md. 519, 573–74 (2006) (stating that the "character" of a function "is dependent on its qualities, not on the mere accident as to the person who has been designated to do it" (quoting *Robey v. Prince George's County*, 92 Md. 150, 161–62 (1900))). Given that there is no "precise

42

definition" of judicial function that can be applied in every case, "our caselaw reflects two factors we have used to determine whether a task is a judicial function: (1) whether the task is of a nature that has traditionally been performed by the judicial branch; and (2) whether the legislative body has provided sufficient guidance limiting the court's discretion so that the court is not called upon to make a decision based on policy, expediency, or politics[.]" *In re Emergency Remedy*, 483 Md. at 395 (internal citations omitted) (citing *Sugarloaf*, 319 Md. at 568–70; *Cromwell*, 188 Md. at 24–25; *Talbot County v. Miles Point Prop., LLC*, 415 Md. 372, 391–92 (2010); *Schisler*, 394 Md. at 574)).

"First, we have considered whether the delegated task requires a court to: (1) act in a manner that is inconsistent with the 'standards or rules normally applied by courts in the exercise of their usual judicial functions,' or (2) exercise powers 'not within the ordinary or recognized powers' of a court[.]" *Id.* (quoting *Sugarloaf*, 319 Md. at 570) (some quotations and internal citations omitted). In *In re Emergency Remedy*, we pointed out examples of delegated tasks that this Court had previously found not to constitute judicial functions, including to:

> approve accounts of county officers before payment, *Robey v. Prince George's County*, 92 Md. 150 (1900); perform duties tantamount to a board of review in assessing property for tax purposes, *Baltimore City v. Bonaparte*, 93 Md. 156 (1901); appoint a board of visitors to supervise the county jail, *Beasley v. Ridout*, 94 Md. 641 (1902); provide for referendum concerning issuance of liquor licenses, *Board of Supervisors v. Todd*, 97 Md. 247 (1903); issue licenses permitting pari-mutuel betting on horse races, *Close Southern Md. Agr. Asso.*, 134 Md. 629 (1919); and issue liquor licenses, *Cromwell v. Jackson*, 188 Md. 8 (1947).

*Id.* at 396 (quoting *Linchester*, 274 Md. at 266) (citation modified).

"Second, we have considered whether the delegating legislative body has provided sufficient guidance for the court's exercise of its discretion such that it is not called upon to render a decision based on policy, expediency, or politics." *Id.* We discussed the laws that we held to be unconstitutional in two cases: *Sugarloaf Citizens Ass'n v. Gudis*, 319 Md. 558, 569 (1990); and *Cromwell v. Jackson*, 188 Md. 8, 28 (1947).

In *Sugarloaf*, we held unconstitutional a Montgomery County Code provision that allowed a court, in certain circumstances where there had been an ethical breach, to void an official act "if the court deems voiding the action to be in the best . . . interest of the public." 319 Md. at 566 (omitting emphasis added in *Sugarloaf*) (quoting Montgomery County Code § 19A-22(b)). We concluded that it was improper to provide a court with the "unguided discretion" to decide whether to allow an official act to stand based solely on the court's assessment of whether voiding the act was in the public interest. *Id*. at 572. Such a determination, we held, was a "question[ ] of policy and expediency" that was a legislative, not a judicial, function. *Id.*

In *Cromwell*, we also held that a law that delegated to judges the task of determining whether to issue liquor licenses was invalid. 188 Md. at 11, 13. The law required judges to "pass upon at least ten questions." *Id.* at 25. Several of the questions, such as those calling for determinations as to whether the petitioners lived or owned property in the vicinity, and whether they believed statements in the application to be true, were not problematic because they were "questions of fact and law upon which the [j]udge is required to exercise . . . judgment after hearing the evidence." *Id.* The remaining questions were of a different kind. They asked, for example, whether the applicant was "a fit person"

44

for a liquor license; whether the place where liquor would be sold was "a proper one"; and whether there was a "[p]roper allocation of licenses" in the area. *Id.* at 25–26. Those questions were "not questions of law or of fact, nor mixed questions of law and fact." *Id.* at 26. Instead, they were questions of "public policy or expediency depending upon many matters[,]" with "no rule to guide the [c]ourt" in rendering a decision. *Id.*

"Notably, the Court contrasted one of the impermissible questions posed by the law it struck down—whether an individual is 'a fit person' for a liquor license—with the superficially similar question, addressed regularly by courts, of whether an individual is fit to have custody of a child." *In re Emergency Remedy*, 483 Md. at 397 (citing *Cromwell*, 188 Md. at 26). "As to the latter question, the Court reasoned, courts had a 'firmly established,' 'definite guide' for the exercise of their discretion, applicable 'in all cases,' which is that 'the welfare of the [child] is the primary consideration in determining whether a person is fit to have custody[.]'" *Id.* at 397–98 (alteration in original) (quoting *Cromwell*, 188 Md. at 26–27). In *In re Emergency Remedy*, we observed that the "*[t]he difference lay not in the terminology of the question,* as both inquiries focused on the fitness of the individual, *but on the existence of guidance for the exercise of the court's discretion*." *Id.* at 398 (emphasis added).

Applying these principles in *In re Emergency Remedy*, we determined that the task delegated to the circuit court by § 8-103(b)(1) of the Election Law Article[11] was a judicial

---

[11] The text of the statute that this Court was considering in *In re Emergency Remedy by Md. State Bd. of Elections*, 483 Md. 371, 398 (2023) was § 8-103(b)(1) of the Election Law Article, which stated:

function. Analyzing the text of the statute, we concluded that the statute "assign[ed] a judicial function." *Id.* at 399. We observed that, under the statute, the court was "called upon to resolve discrete issues based on adjudicatory facts, not 'general facts which help the tribunal decide questions of law and policy and discretion.'" *Id*. (quoting *Talbot County*, 415 Md. at 387–88) (additional quotations omitted).

## C.

### Construing CP § 3-106(c)(4) to Allow Judges To Impose Sanctions To Compel Systemic Reform Is Not Judicial Function

Before I return to the text of the statute, I make a few observations about matters for which there is no dispute.

*First*, the Department has no control over who is committed to a Department facility, or when an individual can be released or discharged. Those decisions are made by courts. CP §§ 3-106(c)(1)(i); 3-114(c); § 3-118(a).

*Second*, there are more individuals who have been determined to be IST and dangerous than there are beds in the State to accommodate these individuals. As it stands, it is statistically impossible for every individual who is subject to a commitment order (and, therefore, on a waiting list) to receive a bed.

---

If emergency circumstances, not constituting a declared state of emergency, interfere with the electoral process, the State Board or a local board, after conferring with the State Board, may petition a circuit court to take any action the court considers necessary to provide a remedy that is in the public interest and protects the integrity of the electoral process.

46

*Third*, not all defendants who have been adjudicated as IST and dangerous fit the same medical profile and level of dangerousness to self or others.

*Fourth*, the Department operates psychiatric facilities that operate with different credentials and different levels of treatment and care. In other words, when it comes to facilities, beds, and defendants who are subject to commitment orders, there is no "one size fits all" solution.

*Fifth*, the bed shortage crisis has been known for over a decade. As reflected in the legislative history of S.B. 233 and H.S. 111 in the 2018 Legislative session, the Floor Report for both bills reflects the General Assembly's awareness that the Department was unable to respond to commitment orders within the statutory time frames because of the lack of available inpatient beds. Indeed, the Fiscal and Policy Note stated that "a new State psychiatric facility *must be constructed to meet the bill's requirements*." Fiscal & Pol'y N., S.B. 233 at p. 5 (emphasis added). Given that a new facility was an "unplanned capital project," the Fiscal and Policy Note reflected that any potential capital or operating expenditures were not factored into the bill's analysis.

*Sixth*, it is clear that all stakeholders are understandably frustrated with the current state of affairs. The judges are frustrated that their commitment orders are not being followed. The Department is frustrated that it cannot consistently satisfy court orders and are managing a waiting list. Local detention facilities are frustrated when their facilities must house patients for whom they lack the ability to provide the necessary care and level of treatment required. And most of all, the defendants who are entitled to an inpatient bed are frustrated by the lack of treatment and care that they are entitled to receive. It is beyond

47

dispute that Maryland's system is in dire need of systematic reform, which requires the coordination and cooperation of all three branches of government.

I return to the examination of the meaning of the phrase "reasonably designed to compel compliance." CP § 3-106(c)(4). The text does not provide any guidance or criteria that a circuit court must apply in determining whether a sanction, and in what amount, will be "reasonably designed to compel compliance." A core judicial function is a court's ability to resolve cases or controversies between parties that come before it. A defendant who has been determined by a court to be an IST and dangerous has a right to be committed to a designated facility. And the Department has an obligation to comply with a court order. Where the Department has a present ability to commit an individual and chooses not to do so, the law provides a remedy through a constructive civil contempt proceeding. Where, however, the Department's inability to place an individual is not willful—as in instances where beds are physically unavailable due to a statewide systemic shortage—the question becomes whether the General Assembly can confer discretionary authority upon 176 individual circuit court judges[12] to determine, on a case-by-case basis, whether, in that judge's subjective view, the Department is "doing enough" (or "did enough" over a decade ago) to effectuate the much-needed systemic reform, and impose a "sanction" in whatever amount that individual judge believes will be "reasonably designed to compel compliance[.]"

_____

[12] *See* Md. Code Ann. Courts and Judicial Proceedings Article (2020 Repl. Vol.; 2025 Supp.) § 1-504, which reflects the number of circuit court judges by county.

48

Returning to the question of whether imposing a sanction under these circumstances constitutes a judicial function, I apply this Court's framework as outlined in *In re Emergency Remedy*, 483 Md. at 395–98. "In considering whether a particular task is a judicial function," we focus "on the act, not the person performing it." *Id.* at 395. In so doing, we look to "(1) whether the task is of a nature that has traditionally been performed by the judicial branch, and (2) whether the legislative body has provided sufficient guidance limiting the court's discretion so that the court is not called upon to make a decision based upon policy, expediency, or politics[.]" *Id*. (internal citations omitted).

In this case, a core judicial function includes determining whether a party to a case or controversy has complied with a court order. If a party fails to comply with a judicial order, the court has the power to hold the party in constructive civil or criminal contempt. Of course, all of the parties agree that when the Department fails to comply with a commitment order, a constructive civil contempt proceeding may be initiated, and a court may enter a civil contempt order provided that the legal requirements are satisfied. Here, however, the statute could be read, as the Appellate Court and the Majority choose to construe it, to authorize a judge to impose a monetary sanction without undertaking a determination of whether the Department's compliance was willful, or whether the Department has a present ability to comply with a commitment order because of an undisputed bedding shortage. And if an individual judge determines—based upon his or her subjective belief—that the Department has not done enough to address the bed shortage crisis, the judge may impose a monetary sanction in an amount the judge believes will "compel" the Department to do more. Such a statutory construction would be

49

exceptionally unusual—I know of no similar statutory scheme. Allowing 176 judges to subjectively determine within the context of each individual commitment proceeding whether that judge believes that the Department could be doing more to address a systemic bedding shortage (or failed to do enough a decade ago) is not a judicial function.

Second, the "legislative body has [not] provided sufficient guidance limiting the court's discretion so that the court is not called upon to make a decision based on policy, expediency, or politics[.]" *In re Emergency Remedy*, 483 Md. at 395. Indeed, the statute does not provide *any* guidance as far as what a judge should consider in determining whether the Department is doing enough to address systemic reform, nor is there any standard for the court to apply in terms of fashioning a sanction. The trial court proceedings in these cases reflect as much.

It is notable that the evidence presented by Mr. Mroz outlined above is substantially the same in the Kent County case and the Baltimore County consolidated cases. That is, Mr. Mroz explained: (1) the bed shortage; (2) the number of individuals determined to be IST and dangerous exceeds the amount of beds, thereby creating a waiting list; (3) the Department's efforts to add beds and effectuate systemic reform; and (4) how the Department makes clinical determinations to assess a defendant's acuity for purposes of moving them from the waiting list to a bed, as well as the different types of facilities that provide different levels of treatment. Based upon the same evidence, two different trial judges awarded hundreds of thousands of dollars in sanctions without regard to any criteria—because there are none.

Indeed, in the Baltimore County case, the trial judge expressed her view that CP § 3-106(c)(4) "was revised in 2018 as a result of the very problems that we're attempting to address today." The court acknowledged that the Department's non-compliance was not willful. And with no testimony or evidence to the contrary, the court found that "the Department really has not made sufficient efforts . . . to address the problem," which started "many years prior to 2018." The court then proceeded to impose a fine of $1,000 a day, which, in the aggregate, totaled several hundred thousand dollars. Clearly, the trial judge's ruling reflects that—based upon her view of the lack of progress to address system-wide failures, which the court noted started over a decade ago—imposing a fine of $1,000 would force the Department to do more to address a system-wide failure.

By contrast, in Kent County, after hearing substantially the same testimony from Mr. Mroz, the judge in that case also found that the Department did not willfully violate the court's order for purposes of contempt. The court concluded that under the *Myers* case, CP § 3-106(c)(4) operated "sort of like a strict liability standard." The court then imposed a sanction of $2,000 starting that day, explaining that the purpose of the cost is to "incentiviz[e] [the Department] to comply with the statute."

I am not faulting the trial courts for their reasoning. Judges are understandably frustrated, and the statute provides no guidance. Therein lies my concern with this statutory scheme from a separation of powers concern. If we interpret CP § 3-106(c)(4) to allow 176 judges to consider substantially the same testimony from the Department's representatives in the context of individual commitment proceedings, and impose a sanction—without regard to whether the Department's non-compliance is willful or

51

whether the Department has a present ability to comply—in whatever amount the judge

determines will compel the Department to do more to address a statewide bed shortage, we

permit trial judges to act beyond their judicial functions.  There is no standard or criteria,

by which the court is to apply in fashioning the "sanction" nor is there a ceiling.  In one

jurisdiction, a judge could listen to Mr. Mroz's testimony and determine that the

Department is doing enough.  In another jurisdiction (or in the same jurisdiction in a

courtroom next door and before a different judge), a judge could say, based on the same

testimony that the Department is not doing enough and impose a sanction of thousands of

dollars per day.  How much is too much?  $10,000 per day?  $50,000 per day?  Interpreting

the statutory scheme in a manner that allows trial court judges to award sanctions against

the Department in any amount and without regard to whether the Department has an *ability*

to comply as the result of a systemic bed shortage, creates an inherently arbitrary sanction

scheme.  Under such a construction, the Legislature has provided zero guidance limiting

the court's discretion so that individual judges across the State are not called upon to make

decisions based on policy, expediency, or politics.  Respectfully, the General Assembly

does not have the ability to confer such unfettered discretion on our trial court judges.

**D.**

**Interpreting CP § 3-106(c)(4) to Permit Judges to Enter Sanctions
Well In Excess of Reimbursement Rates Without a Finding that the Department
Acted Willfully Invades the Core Function of The Executive
And Legislative Branches**

Interpreting CP § 3-106(c)(4) to allow judges to impose sanctions without a finding

that Department's failure to comply was willful, or that the Department had a present

52

ability to comply with the court order also usurps the core functions of the Executive and Legislative branches.

In determining whether action by one branch violates Article 8, this Court has "looked to whether the branch whose power was challenged was usurping a power of another branch[,]" or "encroach[ing] on [another] branch's powers." *Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 372 (2022) (citation modified). To that end, the Court has considered "whether the branch in question had 'a significant role' in the subject of the action, or whether, by contrast, that subject lay solely and exclusively within the purview of a different branch." *Id.* at 372–73 (citation modified). "In considering whether one branch's action usurped a function properly belonging to another branch, the Court has considered not only the respective roles and functions of each branch as to the particular subject matter, but also the surrounding circumstances." *Id.* at 373 (citing *Schisler*, 394 Md. at 542, as recounting the circumstances that led to the General Assembly's adoption of legislation that encroached on the Executive's appointment power).

The Budget Amendment to the Maryland Constitution, Art. III, § 52, establishes "a comprehensive executive budget system in this State[.]" *Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 452 (1987). It mandates that "[t]he General Assembly shall not appropriate any money out of the Treasury except in accordance with the provisions of this section," Art. III, § 52(1), and that "[e]very appropriation bill shall be either a Budget Bill, or a Supplementary Appropriation Bill," *id.* § 52(2). In this context, an appropriation means an expenditure from the Treasury for the purpose of maintaining state government. *Kelly*, 310 Md. at 455–58, 610 (stating that "an appropriation of public funds is made by a

53

constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury a certain sum of money for a specified public object or purpose to which such sum is to be applied." (quoting *Dorsey v. Petrott*, 178 Md. 230, 244 (1940))).

The Budget Amendment requires that "the Governor present a complete and balanced plan of proposed appropriations and estimated revenues for the fiscal year to the Legislature in the form of a Budget Bill." *Kelly*, 310 Md. at 454; *see* Art. III, § 52(3). "The authority to revise estimates received from State agencies and to propose expenditures was granted solely to the Governor in order to establish responsible executive control over budgetary matters." *Judy v. Schaefer*, 331 Md. 239, 247 (1993) (footnote omitted). Although the Legislature has some authority to amend the Governor's budget bill, *see* Art. III § 52(6a), (6b), among other restrictions, the budget must remain balanced:

> Neither the Governor in submitting an amendment or supplement to the Budget Bill nor the General Assembly in amending the Budget Bill shall thereby cause the figure for total proposed appropriations to exceed the figure for total estimated revenues, including any revisions, and in the Budget Bill as enacted the figure for total estimated revenues always shall be equal to or exceed the figure for total appropriations.

*Id.* §52(5). The Governor's budget bill and any supplementary appropriation bill passed by the Legislature, *see id.* §52(1), (2), (8), are implemented by the passage of revenue measures that "supply the moneys necessary for the Treasury to meet the appropriations made by the budget bills," *Kelly*, 310 Md. at 459. *See* Art. III, § 52(8) (requiring a dedicated revenue source to be embodied in any supplementary appropriation bill).

54

In addition, Article III gives force to the appropriations power by strictly limiting the expenditure of funds. Specifically, § 32 provides that, apart from a contingent fund at the Governor's disposal, "[n]o money shall be drawn from the Treasury of the State, by any order or resolution, nor except in accordance with an appropriation by Law." Art. III, § 32; *see Dorsey*, 178 Md. at 235 (recounting the provision's history). Thus, a valid appropriation is a constitutional precondition for the expenditure of public funds, and an expenditure without such an appropriation is unlawful.

The constitutional requirements are implemented through a comprehensive statutory framework for administering the budget. Md. Code Ann., State Fin. & Proc. §§ 7-201–7-239 (2021 Repl. Vol., 2025 Supp.); *see Judy*, 331 Md. at 251–57 (describing history of statutory scheme implementing the executive budget system established by the Budget Amendment). "This comprehensive scheme for an executive budget system, including the administration by the executive of appropriations, has, as its main objective, the maintenance of a balanced budget as required by [the Budget Amendment]." *Id.* at 257 (citation omitted). During any fiscal year, the Governor has only limited authority to approve changes to the amounts appropriated for Executive Branch units. *See Judy*, 331 Md. at 256 (describing Governor's authority to "change the amounts appropriate"). With exceptions not relevant here, the Governor may approve an Executive Branch unit's request to amend an appropriation, State Fin. & Pro. § 7-209(b)(1), but any such amendment may not increase the sum of the appropriations from the General Fund for all the unit's programs, *id.* § 7-209(c)(1)(i).

In addition to addressing appropriations, the statutory scheme limits expenditures in accordance with the Constitution's mandate. It provides that "[m]oney may be disbursed from the State Treasury only in accordance with the current appropriation for a program as amended from time to time in accordance with this title." State Fin. & Pro. § 7-205. Similarly, the statute prohibits any "officer or unit of the State government" from making expenditures "in excess of the total appropriation to the officer or unit"; or "in excess of the amounts set forth in the current schedule for apportionment and disbursement of the appropriation." *Id.* § 7-234(a)(1), (2). Violating this prohibition renders a person "guilty of neglect of official duty and . . . subject to removal." *Id.* § 7-234(c). And, in a provision expressly applicable to any state officer or agent "charged with . . . construction, improvement, or maintenance of a building or work," the law prohibits entering into contracts that purport to bind the State in the absence of unspent funds appropriated for that purpose; "creat[ing] a deficiency"; or "incur[ring] a liability or spend[ing] money in excess of the applicable appropriation." *Id.* § 7-237(a)(1), (b). Violators are subject to criminal penalties and personal liability for the amount of the deficiency or excess. *Id.* § 7-237(d).

In my view, allowing circuit court judges to impose sanctions under these circumstances—without a determination that the Department acted willfully or has the present ability to comply with a commitment order, and in an amount far in excess of the authorized reimbursement rates, *see* Crim. Proc. § 3-106(c)(4); Md. Code Ann., Corr. Servs. § 9-402—invades the core functions of the other branches. Specifically, to the extent that the circuit courts intended to compel the Department to add capacity, the Judiciary is improperly usurping the core budgeting and appropriations functions of the

56

Executive and Legislative branches and, in effect, made those branches' exercise of these core functions subordinate to orders entered by the Judiciary. These sanctions—in the amount of several hundreds of thousands of dollars—act as a de facto appropriation mechanism. Moreover, the statute is silent as to where the "sanction" is to be paid.

In other words, by entering monetary sanctions well in excess of the authorized statutory reimbursement rate, individual judges are, in effect, compelling the appropriations previously rejected by both the Legislature and the Governor in the course of their exercise of their constitutional duties, or compelling the expenditure of unappropriated funds. Either of these outcomes would violate Article 8 as invading the core powers of the other branches because budgeting and appropriating funds for the Executive Branch are core functions of the Governor and the Legislature, and the constitutional and statutory provisions limiting expenditures to appropriated funds serve to ensure that the appropriations power itself has force and that the budget remains in balance. The Judiciary does not have the authority to make appropriations.

### E.

**To the Extent the Monetary Sanctions Orders Were Meant to Compel
the Department to Prioritize Particular Defendants, They Encroached
on the Prerogatives of the Executive Branch to Perform the
Department's Essential Functions.**

The General Assembly has charged the Department with the responsibility to "supervise generally the operation of all State facilities," Md. Code Ann., Health-Gen. § 10-401, and to "[s]upervise the care, custody, and treatment of individuals in State facilities who have mental disorders," *id.* §7.5-205(b). The Director of the Department's

Behavioral Health Administration "shall set standards for admission to a State facility." *Id.* § 10-407; *see also id.* § 7.5-204(a), (b)(2) (authorizing the Director to "[o]rganize and manage the Administration in a manner that will enable it to best discharge the duties of the Administration"). The State's five psychiatric hospitals to which committed defendants are admitted are to be "maintained under the direction of the Administration." *Id.* § 10-406(a); *see id.* § 2-102(b)(2) (allowing the Secretary of Health to "establish, reorganize, or abolish areas of responsibility in the Department as necessary to fulfill the duties assigned to the Secretary").

The way I see it, a statutory interpretation that authorizes a circuit court to impose sanctions on the Department without a finding that the Department acted willfully or had a present ability to comply with the commitment order has the effect of invading the Department's management of the admissions process by ordering priority to a given defendant. The magnitude of the bed shortage has created an inevitable waiting list. According to the undisputed evidence, the Department manages its waiting list based on mandatory, clinical standards of care. Under basic logic, a court order that requires placing one defendant ahead of others necessarily requires *not* placing another committed defendant who is also waiting for placement. In other words, such an interpretation results in a placement based on which judge "yell[s] the loudest." *State v. Crawford*, 239 Md. App. 84, 107 (2018). Such an order does so without regard to the relative acuity of the committed defendants waiting for placement, and it ignores the reality that the Department cannot comply with such orders for all the defendants on its waiting list because it lacks

58

both capacity and funding to do so. Such an interpretation would impermissibly allow a court to invade the Department's essential functions.

**F.**

**Application of the Canon of Constitutional Avoidance**

For all of the above reasons, I would hold that interpreting CP § 3-106(c)(4) to authorize judges to impose sanctions on the Department for failure to place individuals within the 10-day period, without a finding that the Department acted willfully or had the present ability to comply with a commitment order, violates Article 8 of the Maryland Constitution. Such an interpretation would provide the courts with unguided discretion to decide whether to impose sanctions based solely on that court's assessment of whether the Department is doing enough (or did enough in the past) to address a systemic bed shortage— which, to me, is a question of policy and expediency, and not a judicial function. Authorizing individual judges to make this determination on a case-by-case basis creates an inherently arbitrary sanctions scheme. Moreover, giving judges unfettered discretion to award sanctions in the manner as the circuit courts awarded here, would invade the core function of the Executive and Legislative branches by creating a de facto appropriations mechanism.

Because such an interpretation is, in my estimation, unconstitutional, I would apply the canon of constitutional avoidance and interpret CP § 3-106(c)(4) in a reasonable manner consistent with existing judicial functions. My interpretation is as follows.

*First*, the Department's failure to comply with CP § 3-106(c)(4) may result in a constructive civil contempt proceeding. "If the Health Department fails to admit a defendant to a designated health care facility" within the 10-day period, a court "may

59

impose any sanction reasonably designed to compel compliance" upon the findings required for constructive civil contempt, *i.e.*, that the Department acted willfully or had the present ability to comply with the commitment order. Imposing a sanction through a constructive civil contempt proceeding based upon a willful failure to comply with the court's commitment order falls squarely within a core judicial function.

*Second*, where the Department's failure to comply is not the result of willful or purposeful conduct, I would construe CP § 3-106(c)(4) to authorize the court to order that the Health Department "reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the time period specified in paragraph (2)(i) of this subsection at the daily rate specified in § 9-402(b) of the Correctional Services Article." CP § 3-106(c)(4).

Interpreting the plain language of the statute to authorize a court to order reimbursement to the detention facilities for its costs associated with the Department's inability to comply with the statutory deadline is also the type of relief that a court may typically award within its core judicial functions. Adjudicating a fixed statutory entitlement to compensation is the kind of routine task that courts perform. The court determines the date the Department received the commitment order, the date of admission, the number of business days elapsed, and applies the rate the General Assembly supplied.

This construction also aligns the statute with the settled distinction between coercive and compensatory monetary awards. A monetary award imposed through civil procedures is remedial if it either coerces compliance with a court order or "compensate[s] the complainant for losses sustained." *Int'l Union, United Mine Workers of Am. v. Bagwell*,

60

512 U.S. 821, 829 (1994) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)). And where a court imposes a monetary sanction without the procedural protections that attend an adjudication of willful disobedience, the sanction "must be compensatory rather than punitive in nature"—it must be "calibrated to [the] damages caused by" the noncompliance. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017). An award that exceeds compensation is punitive in character, and it may be imposed only with the safeguards that our law locates in the contempt power. The above interpretation precisely tracks this architecture. Coercive and punitive sanctions remain available through constructive civil contempt, where the required findings are established.[13] The statutory reimbursement remedy, by contrast, is compensatory: it is measured by and payable to the governmental unit that incurred the actual cost of the Department's delay. Because the remedy is compensatory, no finding of willfulness is required, just as none is required to award statutory damages or to tax costs.

---

[13] The Majority acknowledges that, "[a]lthough § 3-106(c)(4) is not a contempt provision, its goal of compelling compliance with a court order is essentially identical to the purpose of a constructive civil contempt proceeding." Maj. Slip. Op. at 50. Of course, there is a key and critical difference between a constructive civil contempt finding and the Majority's interpretation of CP § 3-106(c)(4)—the requirement that the court find willfulness. Additionally, constructive civil contempt rests on two things: the present or future ability to comply and a purge provision that enables the contemnor to stop the sanction by complying. *See* Md. Rule 15-207(d)(2) ("In the case of civil contempt, the order shall specify how the contempt may be purged."); *Dodson v. Dodson*, 380 Md. 438, 448 (2004) (explaining that "the law concerning contempt is clear, and that the purpose of civil contempt is to coerce present or future compliance with a court order, whereas imposing a sanction for past misconduct is the function of criminal contempt." (quoting *State v. Roll and Scholl*, 267 Md. 714, 728 (1973))). The Majority thus invokes the purpose of constructive civil contempt while omitting every feature—a willful failure to comply, present or future ability to comply, and a purge provision—that would make these sanctions a legitimate exercise of that power.

The above interpretation is also consistent with the legislative history. The Fiscal and Policy Note projected that "[g]eneral fund expenditures [would] increase minimally due to the bill's *reimbursement provisions*," and that "[l]ocal government *revenues* increase minimally due to the bill's penalty and reimbursement provisions." Fiscal & Pol'y N., S.B. 233 (Third Reader–Revised), at 1 (emphasis added). Nothing in the fiscal analysis contemplates that the Department would pay of hundreds of thousands of dollars to an unidentified payee.

The above interpretation is reasonable in that it places the statutory provisions squarely within a court's core judicial functions: (1) imposing sanctions through a constructive civil contempt proceeding upon a finding of willfulness; or (2) where the Department's failure to comply is not the result of willful or purposeful acts, authorizing the court to order reimbursement to the detention facilities pursuant to established statutory rates. Such an interpretation keeps each branch in their respective lane.

Returning to the sanctions orders entered in the underlying cases, they cannot be upheld under this construction. The sanctions were not based upon a finding of willfulness. And the design was avowedly coercive: the Kent County court set its figure expressly to "double the cost to the Department," "thereby hopefully incentivizing them to comply with the statute." Because the orders were coercive in design and punitive in effect, they could be entered only upon the findings required for constructive civil contempt—findings that both circuit courts expressly declined to make. Nor were the amounts based upon the reimbursement rates intended to reimburse the detention facilities or ordered to be paid to those facilities.

62

# IV

### Monetary Sanctions Are Not "Reasonably Designed To Compel Compliance" Where the Defendant Has Already been Admitted

Applying the above framework, I would hold that where defendants have been admitted to a Department facility, a court may not impose sanctions pursuant to its contempt authority. We have reiterated, on several occasions, that civil contempt sanctions are intended to compel compliance and, therefore, cannot be imposed based on past non-compliance or to punish the contemnor. *See Breona C. v. Rodney D.*, 253 Md. App. 67, 74–75 (2021); *Arrington v. Department of Hum. Res.*, 402 Md. 79, 93–105 (2007) (surveying this Court's civil and criminal contempt jurisprudence and rulemaking). Applying these principles in the context of civil contempt sanctions imposed because of delayed placements by the Department, the Appellate Court has rejected civil contempt sanctions when imposed after the fact because "a party generally may not be held in constructive civil contempt for delayed compliance with a court order if he or she has complied with the order prior to the contempt finding." *State v. Crawford*, 239 Md. App. 84, 125 (2018) ("Holding the party in civil contempt at that point does not have the effect of coercing compliance, but rather, of punishing the party for the past failure to comply."); *id.* ("Because the purpose of civil contempt is to coerce compliance with a court order, once the party has done what he or she was ordered to do, compliance has been achieved, and there is nothing to coerce."). That reasoning applies with equal force here because the statute requires that any sanction must be "reasonably designed to compel compliance." CP § 3-106(c)(4). That a contempt sanction cannot "coerce compliance," *Dodson v.*

*Dodson*, 380 Md. 438, 448 (2004), if the alleged contemnor has already complied confirms the natural understanding of the statutory term in CP § 3-106(c)(4): a sanction cannot "compel compliance," and necessarily is not "reasonably designed" to do so, if the Department has already placed the defendant.

I would, however, hold that where the defendant has been admitted to a facility prior to a hearing, under CP § 3-106(c)(4), a court may order the Department to reimburse the detention facility for the expenses and costs incurred in retaining the defendant beyond the 10-day time period at the daily rate established in the § 9-402(b) of the Correctional Services Articles.

For all of the above reasons, I would reverse the judgment of the Appellate Court.

Justice Gould and Justice Killough have authorized me to state that they join in this opinion.